This is an appeal from a judgment in an election contest ordering that another election for mayor of Loxley, Alabama, be held. We affirm.
Jack Ryals and Jacob "Jake" Jacobs were candidates in the July 8, 1980, Loxley mayoral race; Ryals was the apparent winner of the election, receiving 206 votes to Jacobs's 204 votes. Jacobs contested the election, alleging inter alia that the vote of Larry Goodman was illegally cast and counted for Ryals because Goodman is a convicted felon; that the votes of Judy, Paul, Cledis and Virgie Peterson were illegally cast and counted for Ryals because none of the Petersons were domiciled in Loxley; and that William Foster, Mable Le Clair and George Smith would have voted for Jacobs but refrained from voting due to the intimidation by the Loxley Police Chief. Ryals counterclaimed that the votes of Curtis and Inez Brooks were illegally cast and counted for Jacobs because neither was domiciled in Loxley.
The trial court, hearing the evidence ore tenus, rejected the votes of Larry Goodman, Judy and Paul Peterson and Curtis and Inez Brooks. The court also added the vote of George Smith to Jacobs's total after he specifically found that Smith would have voted for Jacobs had he not been intimidated by the Loxley Police Chief. The court made no finding regarding the alleged intimidation of Foster and Le Clair. A new election was ordered when the final tabulation resulted in a 203-203 tie vote.
On appeal, Jacobs contends that the trial judge should have counted the votes of Curtis and Inez Brooks because they were domiciled in Loxley, and that he should have rejected the votes of Cledis and Virgie Peterson because they were not domiciled in Loxley. Ryals counters by arguing, and we think correctly so, that in light of the ore tenus rule there was sufficient evidence to support the trial ju dge's findings on both issues.
We note at the outset that neither Cledis nor Virgie Peterson testified at the trial. Despite their absence, however, the testimony established that Cledis is engaged in the business of hauling fresh produce. The corporation he owns, Quality Trucking, Inc., maintains offices in both Summerdale, Alabama, near Loxley, and Antigo, Wisconsin. Due to the nature of his business, Cledis is required to follow the various growing seasons throughout the country. This takes him from Wisconsin to California, through Alabama and on to Florida. During the two weeks he typically spends each spring in Alabama, Cledis operates from his Summerdale office and resides at the residence he maintains in Loxley. According to Emmett Middleton, whose son is married to Cledis's daughter, at one time Loxley was the Petersons' year-round home. Cledis and Virgie filed a 1979 Alabama income tax return and paid taxes due thereunder. Cledis retains his Alabama driver's license. Both Virgie and Cledis are listed as registered and qualified voters on the Town of Loxley voter list and both voted in the July election by absentee ballot. In casting their vote, they executed the absentee voter's *Page 778 
affidavit wherein they affirmed that they were Loxley and Baldwin County residents entitled to vote in the Loxley municipal election. This evidence establishes that, at least at one time, Virgie and Cledis were domiciled in Loxley.
Jacobs argues that the Petersons are no longer domiciled in Loxley because, as several witnesses testified, they are only in Loxley two weeks each year and during the remainder of the year they are either hauling produce in other parts of the country or are residing at their Antigo, Wisconsin, home. Jacobs supports this argument with documentary evidence such as a check in payment of the rent of Quality's Summerdale office drawn on an Antigo bank and showing an Andigo address for Quality, as well as a listing in the "Produce Reporter" which listed Peterson's address as Antigo.
We do not think that Jacobs's evidence is sufficient to prove that the Peterson's abandoned their Loxley domicile and acquired a new domicile in Andigo. In Ex Parte Weissinger,247 Ala. 113, 22 So.2d 510 (1945), this Court recognized the following principles concerning one's domicile:
 [A] domicile, once acquired, is presumed to exist until a new one has been gained "facto et animo." * * * * And in order to displace the former, original domicile by the acquisition of one of choice, actual residence and intent to remain at the new one must concur. "Domicile of choice is entirely a question of residence and intention, or, as it is frequently put, of factum and animus." * * *
 A change of domicile cannot be inferred from an absence, temporary in character, and attended with the requisite intention to return. To the fact of residence in the new locality there must be the added element of the animus manendi before it can be said that the former domicile has been abandoned. The intention to return is usually of controlling importance in the determination of the whole question. * * * *
 * * * * As a general proposition a person can have but one domicile, and when once acquired is presumed to continue until a new one is gained facto et animo, and what state of facts constitutes a change of domicile is a mixed question of law and fact. * * * *
 One who asserts a change of domicile has the burden of establishing it. * * And "where facts are conflicting, the presumption is strongly in favor of an original, or former domicile, as against an acquired one," etc. * * * *
247 Ala. at 117, 22 So.2d at 513-14 (citations omitted). Similarly, in Wilkerson v. Lee, 236 Ala. 104, 181 So. 296
(1938), it was stated:
 A voter having acquired a legal residence, been duly registered as a voter of the county and precinct or ward * * * may retain such residence until he has abandoned and removed therefrom with the intent to become a resident elsewhere. Temporary absence from one's residence for the purposes of his employment and the like, without the intent to abandon the home town and acquire a domicile elsewhere permanently, or for an indefinite time, does not forfeit his right to vote.
236 Ala. at 106-07, 181 So. at 298 (citations omitted).
Bearing these principles in mind, we are compelled to conclude that the trial judge properly included those votes cast by Virgie and Cledis in the total votes cast in the Loxley mayoral election. Because Virgie and Cledis had, at one time, acquired a Loxley domicile, the burden was cast upon Jacobs to establish that the Petersons abandoned their Loxley domicile and acquired a new domicile in Antigo. Even if the facts shown are construed in Jacobs's favor, the facts are, at best, conflicting. Under such circumstances the presumption that the Petersons continue to maintain their Loxley domicile will be applied. Ex Parte Weissinger, supra; Wilkerson v. Lee, supra.
The trial judge's determination of this issue is therefore supported by the law and evidence and is due to be affirmed.
Jacobs also argues that the trial judge erred when he rejected the votes cast *Page 779 
by Curtis and Inez Brooks. Again we must disagree. Curtis testified that he and his wife moved from McKenzie, Alabama, to Loxley in April of 1980 with the hope of finding employment there. While in Loxley, the Brookses lived with Curtis's relatives. Both Curtis and Inez voted in the Loxley municipal election by challenge ballot. When Curtis had not secured employment by the last week of July, they moved back to McKenzie where he then found a job. Upon cross examination, Curtis testified as follows:
 Q. Mr. Brooks, when you came to Loxley, did you come to Loxley with the intent of that being your home?
A. Yes, sir, if I could have found work to have done.
Q. Well, why did you leave Loxley?
A. Because I couldn't find no job.
Q. Couldn't find a job?
A. No.
Q. But when you came —
A. Came with the intention of work.
Q. Making Loxley your home?
A. I was hoping then to get me a job.
Inez's testimony was substantially the same as that given by Curtis. It is clear from the foregoing that the Brookses' intent of making Loxley their home was strictly conditioned upon Curtis's securing employment there. This is not such an unequivocal "intention to remain permanently, or at least, for an unlimited time" as is necessary to establish a domicile.Rabren v. Mudd, 285 Ala. 531, 234 So.2d 549, 553 (1970). Seealso 28 C.J.S. Domicile § 11 (4) (1941). Therefore, the trial court correctly determined that their votes were illegal and not to be included in the final tabulation.
In his cross-appeal, Ryals contends the trial court erred by adding George Smith's vote to Jacobs's total. We agree. Although there is a dearth of authority on the question of whether the vote of an elector who would have voted but failed to do so can be awarded to either candidate, it has been stated that
 A voter who did not vote, though legally entitled to do so, and although he did not vote because he was unlawfully prevented, can not afterwards be permitted to testify that he would have voted for a certain person, notwithstanding that the lawful votes so excluded would, if cast as intended, have changed the result.
 The election is to be decided by the number of legal votes actually cast, and not by ascertaining what might have been cast. The election may be held invalid because of the suppression of legal votes, but public policy forbids that, after it is known just how many votes are necessary to change the result, it should be permitted to change it upon the present statement of voters as to their past intentions.
F. Mechem, Public Offices and Officers, § 237 (1890). Not only is this rule sound from a public policy standpoint, but it is also supported by those provisions which govern municipal elections in this state. See Code 1975, § 11-46-1 et seq. It is provided in Code 1975, § 11-46-70 that
 If, on the trial of the contest of any municipal election, it shall appear that any person other than the one whose election is contested, received or would have received, had the ballots intended for him and illegally rejected been received, the requisite number of votes for election, judgment must be entered declaring such person duly elected * * *.
 If it appears that no person has or would have had, if the ballots intended for him and illegally rejected had been received, the requisite number of votes for election, judgment must be entered declaring this fact, and such fact must be certified to the municipal governing body and the vacancy in the office, election to which had been contested, shall be filled in the manner prescribed by law for filling the vacancy in such office.
* * * * * *
This provision is couched in terms of "illegally rejected" votes. Logically, in order to have a rejected vote, an elector must have either voted or attempted to vote in an election only to have his ballot refused or *Page 780 
rejected. Such is not the case here. George Smith never cast his ballot in the Loxley municipal election. It would be a strained construction of both the term "rejected" and the provisions of Section 11-46-70 to characterize a vote which was never cast as a rejected vote. Accordingly, the trial judge's inclusion of Smith's intended vote was in error. This does not mean, however, that the trial judge's decision to order a new election was also in error.
It is provided in Code 1975, § 11-46-71 that
 No misconduct, fraud or corruption on the part of the election officers, the marker, the municipal governing body or any other person, nor any offers to bribe, bribery, intimidation or other misconduct which prevented a fair, free and full exercise of the elective franchise can annul or set aside any municipal election unless the person declared elected and whose election is contested shall be shown not to have received the requisite number of legal votes for election to the office for which he was a candidate thereby, nor must any election contested under the provisions of this article be annulled or set aside because of illegal votes given to the person whose election is contested unless it appears that the number of illegal votes given to such person, if taken from him, would reduce the number of votes given to him below the requisite number of votes for election. No election shall be annulled or set aside because of the rejection of legal votes unless it appears that such legal votes, if given for the person intended, would increase the number of his legal votes to or above the requisite number of votes for election.
 The trial judge specifically found that Smith was a registered voter and was a resident of Loxley, Alabama, on July 8, 1980; having been such more than 30 days prior to the election. That he went to the polls to vote and that he was so intimidated by the Chief of Police, Condie Langham, that he was prevented from voting and that George Smith, Jr. testified that if he had been allowed to vote he would have voted for Jacob (Jake) Jacobs.
Although Smith's intended vote could not be added to Jacobs's total to either declare him the winner or declare a tie vote, the fact that he was entitled to vote and would have voted but for the intimidation can be considered in determining "the requisite number of legal votes for election to the office * * *." Applying this principle, a total of 410 votes were actually cast in the Loxley election; 206 for Ryals and 204 for Jacobs. Five votes were ultimately rejected in the election contest, thus leaving a total of 405 voters who actually participated in the election. Smith would have voted but for the intimidation. Adding his "vote," a total of 406 persons either participated or would have participated in the election. In order to be declared the winner of the election, a candidate must have received a majority vote of that number, i.e., 204 votes. Ryals received 203 votes to Jacobs's 202 votes. Neither candidate received the requisite number of votes. In such circumstances the election may be set aside and a new one ordered because it is evident that the intimidation of Smith "prevented a fair, free and full exercise of the elective franchise" and, adding Smith's "vote", prevented Ryals from receiving the "requisite number of legal votes for election to the office for which he was a candidate."
Because the election did not result in a tie vote, Jacobs's argument that the Loxley City Council should fill the mayoral vacancy pursuant to Code 1975, § 11-46-70, is not well taken. That section provides in part:
 If it appears that no person has or would have had, if the ballots intended for him and illegally rejected had been received, the requisite number of votes for election, judgment must be entered declaring this fact, and such fact must be certified to the municipal governing body and the vacancy in the office, election to which had been contested, shall be filled in the manner prescribed by law for filling the vacancy in such office. *Page 781 
This section has application to those situations where, in an election contest, the judge ultimately determines that a tie vote results from the total number of legal votes actually cast in an election. When intimidation which affects the outcome of an election is involved, the provisions of Code 1975, §11-46-71, supra, apply.
We have carefully reviewed those other issues raised by Jacobs and have reached the conclusion that they are without merit.
For the foregoing reasons the decision of the trial judge ordering a new election for the mayor of Loxley is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, EMBRY and ADAMS, JJ., concur.