Anthony Long appeals the decision of the Perry Circuit Court ordering a new election in this challenge to the mayoral election for the City of Marion, brought by mayoral candidate Robert Bryant. The issues in this election contest concern mainly the validity of several votes cast by absentee ballots.
 Facts and Procedural History
In the August 24, 2004, mayoral election for the City of Marion, three candidates qualified and ran: Robert Bryant, Herb Tucker, and Anthony Long, the incumbent. A total of 2,156 votes were cast for the office of mayor. After the votes were tallied on election day, Long received 1,120 votes, Bryant received 997 votes, and Tucker received 39 votes. On August 26, 2004, Long was declared the winner. On August 30, 2004, Bryant contested the election on the grounds that illegal absentee-ballot votes were cast by: (1) persons not registered to vote; (2) persons registered to vote, but voting in the wrong ward or district; (3) persons not residents of the City; (4) persons convicted of crimes involving moral turpitude; (5) persons whose ballots were illegal because of insufficient witnesses; (6) persons who had not lived in the City long enough to participate in the election; (7) persons who gave fraudulent or fictitious addresses; (8) persons who were dead; and (9) persons who had been fraudulently induced to vote for Long.
On September 3, 2004, Long filed an answer. On September 22, 2004, Long amended his answer and filed a motion to dismiss on the grounds that Bryant had failed to file a verified petition in accordance with § 17-15-29, Ala. Code 1975. That same day, the trial court entered an order denying Long's motion to dismiss. On September 27, 2004, Long filed a petition for a writ of mandamus with this Court seeking an order directing the trial court to, among other things, dismiss Bryant's complaint for failure to file a verified petition. This Court stayed all proceedings pending a decision on Long's petition. On January 7, 2005, we denied *Page 675 
the petition for a writ of mandamus without an opinion. Exparte Long, 924 So.2d 801 (Ala. 2005)(table).
On July 26, 2005, trial began and lasted until August 5, 2005. After the trial, both parties submitted posttrial briefs to the court. A year and a half later, on December 19, 2006, the trial court entered the following order:
 "This cause came to be heard before this court on July 26, 2005 and ended on August 5, 2005. The Court, after considering the testimony, evidence and arguments presented, makes the following findings, conclusions and judgment:
 "BACKGROUND "On August 24, 2004, the City of Marion, Alabama, located in Perry County, held its quadrennial general election. The offices up for election were Mayor and all five (5) of the city council districts. Each seat was contested. Relevant to this cause was the Office of Mayor. Three candidates were on the ballot. They were Robert Bryant, the Contestant (Bryant), Anthony `Tony' Long, the Contestee (Long), and Herb Tucker, a non-party to this action. A total of 2,156 votes were cast for the Office of Mayor. This was 38 more votes than cast in the race for the council district as 2,118 votes were cast.
 "The relevant vote totals showed Bryant with 640 (64%) of his total of 997 votes from voters who cast their ballot at the polls, and 357 (36%) of his total from absentee ballot votes. Of Bryant's absentee ballot votes, 95 were challenged and 8 were I.D. challenged. Long received 649 (58%) of his total of 1,120 votes from voters who cast their ballots at the polls, and 471 (42%) of his total from absentee ballot votes. Of Long's absentee ballot votes, 246 were challenged and 12 were I.D. challenged. The non-party challenger, Herb Tucker, received a total of 39 votes. Neither party offered any evidence to challenge or dispute Mr. Tucker's votes. Therefore, 39 votes will be listed as his final vote total to be discussed at the conclusion of this order.
 "On August 26, 2004, the results of the election were canvassed and Long was declared the winner by a margin of 41 votes in avoiding a run-off. Of the 2,156 votes cast, 1,078 votes plus 1 vote, for a total of 1,079 would be needed for an outright victory. Long exceeded that total by 41 votes.
 "Bryant timely filed his election contest on August 30, 2004. Various pre-trial motions were filed and ruled upon, including a Motion to Dismiss and [a petition for a] Writ of Mandamus, which the Alabama Supreme Court ultimately denied. The case was thereupon scheduled for discovery and the resulting trial.
 "LEGAL STANDARDS "Statutes providing for election contest are to be strictly construed. Parker v. Mt. Olive Fire Rescue Dist., 420 So.2d 31 (Ala. 1982). Contest of municipal elections are governed under the authority of Alabama Code § 11-46-69, which included Articles 2 and 3 of Chapter 15, Title 17. This includes § 17-15-20 through -63 [now § 17-16-47
through -76]. The requirements of § 17-15-29 [now § 17-16-56] are to be read and followed together with § 11-46-69 to institute the contest. The requirements of § 11-46-70-74 are also relevant here.
 "FINDINGS "The court received evidence from both parties concerning the legality of *Page 676 
Absentee Ballots and took the issues and procedural questions under advisement. Neither party offered any evidence to dispute the votes cast at the polls. Thus, those vote totals for each respective party are retained.
 "The court heard arguments concerning whether both parties complied with § 17-15-21 [now § 17-16-48], Notice of Nature of Evidence. The court finds that Bryant did comply with the statute. However, Long arguably did not comply with the statute. Long failed to openly tender the requisite notice, even while having time to do so during trial and having the court to continue the proceedings when necessary. However, the court finds his proffer sufficient. Thus, Long's relevant evidence will be considered in the final results.[3]
 "BRYANT'S ARGUMENTS "1. No Reason Indicated on the Application.
 "Exhibits 13, 29, 90, 102, 103, 104, 105, 107, 108, 111, 112, 113, 114, 115, 143, 354 and 355 all failed to indicate a reason for voting absentee on the application. Such ballots should not have been sent or counted. Each vote was for Long. The number is seventeen (17). Thus, seventeen (17) votes are deducted from Long.
 "2. No Reason Indicated on the Affidavit.
 "Exhibits 70, 86, 100, 101, 109, 110 and 142 fail to indicate a reason for voting absentee on the ballot affidavit. Each was a vote for Long. Such votes should not have been counted. The number is seven (7). Thus, seven (7) votes are deducted from Long.
 "3. No Reason Requested on the Application or Affidavit.
 "Exhibits 46 and 106 do not indicate a reason for voting on the application or affidavit. Each was a vote for Long. These votes should not have been cast or counted. Thus, two (2) votes are deducted from Long.
 "4. Inconsistent Reason For Voting.
 "The following were votes cast for Long and the reason for voting on the affidavit was inconsistent with the initial request on the application. These votes should not be counted. Four voters applied by stating they will be out of the county, but averred that they are physically incapacitated. They are Exhibits 52, 64, 306 and 331. Four voters applied by stating they were physically incapacitated, but averred that they will be out of the county. They are Exhibits 77, 78, 135 and 350. Three voters applied by stating they will be out of the county, but averred they will be working a conflicting 10-hour work shift. They are Exhibits 96, 302, and 323. One voter, Exhibit 69, stated in her application that she would be working a conflicting work schedule, but avers she will be out of the county.
 "Thus, this category totals twelve (12) votes. These votes should be subtracted from Long.
 "5. Disqualifying Convictions.
 "They found seven (7) voters who cast ballots for Long to be disqualified due to felony convictions. Bryant presented some evidence of two (2) others, but the Court only found seven (7) to be disqualified; there was no evidence of any restoration of voting rights or pending appeal or court-ordered reversal regarding these votes. Exhibit 40 had a Possession of Controlled Substance conviction and was sentenced on January 5, 2004. He also had an improper non-government-issued I.D. Exhibit 41 had an Arson 2nd conviction and was sentenced March 4, 1996. Exhibit 43 had a Possession *Page 677 
of Forged Instrument 2nd conviction and was sentenced on November 1, 1997. Exhibit 44 had an Unlawful Imprisonment 1st and Arson 2nd conviction and was sentenced on May 4, 1998. Exhibit 49 had an Unlawful Distribution of Controlled Substances conviction and was sentenced on March 12, 2003. Exhibit 152 had a Vehicular Homicide conviction and was sentenced on February 23, 2004. Exhibit 206 had a Burglary 3rd conviction and was sentenced on November 13, 2000. Thus, seven (7) votes are deducted from Long.
 "6. Improper Identification.
 "In addition to Exhibits 40, 225 and 238,[4]
seven (7) other voters were presented with improper identification pursuant to § 17-10A-1 [now § 17-10-1]. Bryant argued more voters; however, the Court's review of the exhibits showed the following: Improper identification submitted for Exhibits 151, 238, 225, 242, 243, 244, 245, 247, 248 and 249. Each of these voters, and Exhibit 40, have a non-governmental generated I.D. that does not fall within the acceptable forms of I.D. listed in § 17-11A-1 [now § 17-9-30 and § 17-17-28]. Long's arguments are considered and failed. Thus, ten (10) votes from Long are taken.
 "7. Votes Changed or Altered on Ballots.
 "Bryant presented three (3) instances in which a voter's ballot was changed or altered. Each ballot had whiteout or correction fluid on them. The Court could clearly see that Bryant's name was marked, then whiteout was used to mark Long. The voter could have received another ballot and marked the ballot as spoiled. This was not done. This involved Exhibits 118, 209 and 341. Exhibit 118 bears an initial which could very well be that of the voter. The initial is next to Long's name in addition to the mark. These ballots go beyond the integrity of the votes and really trouble the Court. They should be referred to the District Attorney. However, the Court will give Exhibit 118 the benefit of the doubt, as there is credible initial beside the change. No vote is deducted for Exhibit 118. No evidence was offered to cure these problems, nor any of the problems mentioned in this Order. In fact, no voters were called to cure any defects found thus far.
 "In light of the evidence, the Court finds that two (2) votes are due to be taken from Long and two (2) votes added to Bryant.
 "8. Improper Address on Application.
 "Title 17-10-5 gives the procedure for delivery of absentee ballots to a voter. Pertinent to the Court's inquiry is the requirement of ballots being sent to `. . . the address where the voter regularly receives mail . . .' Several applications were requested to be sent to obvious addresses where the voter did not regularly receive mail. The statute directs that applications mailed to a fraudulent address may be suspect and should be turned over to the District Attorney. The Absentee Election Manager sought to assist the voters by determining alternate addresses to send the ballots. This Good Samaritan act runs afoul of the statute, as it was the District Attorney's responsibility after the fraud was suspected. Yes, there are circumstances in § 17-10-5 [now § 17-11-5] which the Absentee Election Manager makes inquiry when there is a continuous absentee voting pattern. It was the District Attorney's responsibility to further continue with the applications. Thus, the ballots should not have been sent out and the votes not counted. This conduct jeopardizes the integrity of the system. *Page 678 
 "This situation involves a request for several applications to be mailed at the same post office box. This runs afoul of the statute and was the driving force behind revisions of the statute. All votes cast concerning these voters were for Long. They should have not been cast.
 "These votes involve:
 "P.O. Box 515 — Exhibits 5, 7, 32, 38, 76, 118, 145, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 201, 203, 211, 227A, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 238A 239, 240, 241, 250, and 251, a total of forty-five (45) votes to be deducted from Long.
 "P.O. Box 536 — Exhibits 4, 6, 23, 31, 66, 67, 68, 119, 120, 126, 141, 144, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 300 and 327, a total of forty-four (44) votes to be deducted from Long. "P.O. Box IMS — Exhibits 36, 39, 55, and 146, a total of four (4) votes to be deducted from Long.
 "P.O. Box 1149 — Exhibits 30, 34 and 37, a total of three (3) votes to be deducted from Long.
 "Bryant offered several more voters and addresses. However, the Court concluded only the above. Thus, ninety-six (96) votes are deducted from Long for this category.
 "9. Other Concerns.
 "Bryant argued several forgeries and improper signatures, but presented no expert testimony to assist the Court. The Court can review and note variances in signatures. However, that is not persuasive, as people at times can write differently depending on the circumstances and conditions. The Court did find some obvious signature variances, which the Court finds were not from the same writer. They are Exhibits 67, an obvious variance; 76, signature on application acknowledged by someone else; 120, an obvious variance altogether; 223, an obvious print on the application; and 250, an obvious variance. However, these voters are already included on other deletions.
 "Bryant offered other evidence and arguments concerning the residency of various students. Such arguments are not accepted. Also, the vote of an under-age person is also not accepted as the application concludes otherwise and no other evidence was presented.
 "LONG'S ARGUMENTS. "10. Improper Discovery.
 "The Court denied these arguments raised by Long during the proceedings. Long participated in the discovery process and had copies of the documents produced in a manner to keep the ballots with the applications so the Court could determine the actual votes. To cry foul again is unwarranted.
 "11. Applications and Affidavits Improper.
 "Long raised the argument that certain exhibits failed to meet the captioned requirements. Exhibits 35, 36, 37, 40 and 42 all failed to indicate a reason for voting absentee on the affidavit. So did Exhibits 39 and 41. Exhibit 38 was not made available to the Court. Exhibit 9 listed an inconsistent reason on the application and affidavit. Exhibits 71 and 112 were sufficient and Long's arguments are incorrect and fail. All of the above were votes for Bryant. Thus, eight (8) votes are deducted from Bryant.
 "12. Improper Signatures.
 "Long failed to submit sufficient evidence on improper signatures or other *Page 679 
persons signing for another as he argued. However, Exhibits 28 and 29 do not contain a reason or signature on the affidavit. However, the Exhibits do not show who received the voter's vote. Long failed to submit expert testimony to assist the Court. The lay witness was not helpful and from a review of the ballots, an apparent bias witness as she was a candidate who received votes just like Bryant. However, the Court viewed the Exhibits and could only conclude two (2) obvious variances in the signatures, Exhibits 65 and 68. Each vote was for Bryant. Thus, two (2) votes are deducted from Bryant.
"13. P.O. Box Addresses.
 "Long argues that voters for Bryant who used P.O. Boxes should be excluded. However, the P.O. Box is not the litmus test. It is the fraud aspect of a place a voter does not regularly receive mail or is not registered at. Long has not submitted any evidence to disqualify the votes he argues against. In fact, the exhibits show the P.O. Box addresses to be consistent on the application and affidavit in many instances. There was no evidence of wholesale request to be mailed to a certain P.O. Box as raised by Bryant. In fact, Exhibits 6, 18, 62, 63, 64, 65, 66, 67, 68, 69 and 70 are all consistent. Long's arguments are without foundation and fail.
 "14. Non-Residents.
 "Like Bryant, Long's arguments and evidence on this issue are not persuasive.
 "15. Bad Faith.
 "Long presents no credible evidence to support his `bad faith' arguments as to Exhibits 27A, 31, 34, 42, 71, 72, 86, 87, 89, 114, 115, 116, 117 and 118. The arguments fail.
 "Tally "After a review of the findings, the court tallies the vote as follows:

Category Bryant Long Tucker
Certification 997 1,120 39
1. -17
2. -7
3. -2
4. -12
5. -7
6. -10[1]
7. +2 -2
8. -96
9. 0
10. -8
11. -2
12. 0
13. 0
14. 0
"Net Total 989 967[1] 39

 "Total Legal Votes Cast — 1,995
 "Total votes needed for victory — 998 + 1 = 999. No winner is declared. A run-off election is needed.
 "CONCLUSION "There was certain testimony which gravely concerns the Court and warrants investigation by the District Attorney's Office and other agencies. Voter H.L.K., a black male, testified, he completed his application for an absentee ballot with J.E. After his ballot did not arrive, H.L.K. said he contacted J.E. J.E. told him he needed to come to Mr. Long's office. After arriving and a confrontation, H.L.K. stated he was given his ballot. *Page 680 
 "Voter V.G., a white male, at ___ Street, Marion, Alabama, testified that A.K.H., R.H. and T.J.H. came from Selma to live with him a few days before the election. He stated they registered to vote, voted in the election, and then returned to Selma shortly after the election. Voter D.G., the wife of V.G., verified these facts and stated she was present when the children voted.
 "There appeared to be a voter virus which caused several others to move into the city limits just before the election. For instance, voter B.W.N. testified she had lived in Sprott and Bibb County prior to the election. However, she was renting a place from Mr. Long during the election cycle. Voter L.C.H. testified he currently lives in Uniontown, but intended to have the address on Centreville Street in Marion as his home. Voter P.W.P. testified his utilities were off at the time and he had to live in the city limits with his father-in-law. He stated he had lived in Scott Station with his grandmother. Voter B.H.P. testified she moved into the city limits with her father because her power was off. Voter D.S.H., who had lived and currently lives in Sprott, testified she moved into the city limits from July to October, 2004 because she was going through a divorce. Voter C.R.H. testified she lived in town for convenience during the election cycle. Further, she stated as of October 2004, she moved back to Sprott. Voter F.M., who had lived and is currently with his father in Sprott, moved into the city limits from May 2004 to December 2004 because of family problems. Voter C.N. testified he moved into the city limits with his uncle and stayed from June 2004 to September 2004. He stated he never intended to live there but it was just a place to stay. Further, he said he changed his voting location to the city for the election. The Court rejects these votes and declare them ineligible voters.
 "Furthermore, there were numerous instances where the voter testified the signature on the Application for an Absentee Ballot was not their signature, i.e., C.R.H., J.R.L.C., D.W., H.L.K., and B.M.M. Additionally, J.R.L.C. testified, the signature on his wife's application was not his wife's signature.
 "More particularly, there were applications which requested ballots be sent to a P.O. Box. There was no evidence offered to support who owned the P.O. Box or who authorized the request. This included approximately forty-one (41) applications for P.O. Box 536, forty-one (41) for P.O. Box 515, and seven (7) applications for P.O. Box 1148.
 "JUDGMENT OF THE COURT "Pursuant to Alabama Code [1975,] § 11-46-70
. . ., the Court declares that no person (candidate) has the requisite number of votes to be declared a winner. Such fact is certified to the City of Marion, Alabama that a vacancy exists in the Office of Mayor and a run-off election, pursuant to § 11-46-55(d) is so Ordered.
 __________
 "[3] Long offered evidence of alleged illegalities of some 50 ballots specifically and other generally.
 "[4] Exhibit 40 is also covered under disqualifying convictions and Exhibits 225 and 238 are covered under improper P.O. Boxes."
(Some footnotes omitted.) Long appeals.
 Standard of Review
An election contest is a statutory matter, and the statute governing the election must be strictly observed and construed.Watters v. Lyons, 188 Ala. 525, 66 So. 436 (1914). "In reviewing a trial *Page 681 
court's findings of fact in an election contest, we apply the same standard used by appellate courts when the trial court in a nonjury case has taken a material part of the evidence throughore tenus testimony; that is, we will not disturb the trial court's findings of fact unless those findings are plainly and palpably wrong and not supported by the evidence."Williams v. Lide, 628 So.2d 531, 534 (Ala. 1993).
 Analysis
Long argues that the trial court did not have subject-matter jurisdiction over the case because Bryant did not file a properly verified petition or statement of contest as required by § 17-15-29 (now § 17-16-56). Specifically, Long contends that Bryant's statement was not verified because Bryant failed to swear before a notary public or someone authorized to administer oaths that the facts and allegations in the statement were true.
Section 11-46-69(a), Ala. Code 1975, provides that "[t]he election of any person declared elected to any office of a city or town may be contested by any person who was at the time of the election a qualified elector of such city or town. . . ." Section 11-46-69(b) provides that such contest shall be instituted in the manner set out in § 17-15-29. Section 17-15-29 provided, in pertinent part, that "the party contesting must file in the office of the circuit clerk of the county in which the election was held, a statement in writing, verified by affidavit, of the grounds of the contest as provided in this article. . . ." (Section 17-16-56 contains this same language.)
In Washington v. Hill, 960 So.2d 643 (Ala. 2006), the defeated candidate filed an election contest in a mayoral race. The candidate who had been declared the winner argued that the trial court exceeded its discretion by allowing the election contest to proceed even though the defeated candidate had not complied with § 17-15-29. The candidate argued, among other things, that the defeated candidate had failed to swear, as part of her affidavit, that the statements contained in the complaint were true. This Court stated:
 "[T]he applicable statute does not require the statement in an election contest to, as [the candidate] asserts, include specific reference to the date and time of the election being contested or specific wording in an affidavit averring that the statement is true. What the text of the statute requires is language that makes sufficiently clear which election is being challenged and some form of an affidavit by the contestant that communicates the grounds of the contest. As a result, we conclude that the trial court did not err by failing to require stricter adhesion to the form of the election-contest statement than is required by the text of the statute."
960 So.2d at 648.
In the present case, Bryant completed a "notice of contest" complaint that contained the relevant information regarding the election. The complaint was signed in the presence of a notary public, even though the notary public refers to the complaint as a "conveyance" and states that the complaint was voluntarily signed "for the purposes therein contained." We cannot say that Bryant's election-contest statement failed to comply with § 17-15-29. Bryant's complaint sets out which election is being challenged and contains an affidavit setting out the grounds of the contest.
Long contends that the trial court erred in discounting votes for Long on the basis that the votes were cast by persons with a felony record. Seven votes were cast by persons convicted of a felony, but two of those person's names had not *Page 682 
been removed from the voter-registration list. Long urges this Court to overrule Williams v. Lide, supra, and allow the two persons whose names had not been removed from the voter registration list to have their votes counted.[2]
In Williams, a losing candidate for county office contested the election on the ground that eight persons who had been convicted of a felony for which they were sentenced to time in a penitentiary and whose voting rights had not been restored had been allowed to vote. The competing candidate argued that the eight persons were entitled to vote because the board of registrars had not notified them that their names had been removed from the voter-registration list as required in § 17-4-132 (now repealed). This Court held:
 "We determine that the legislative intent for requiring notice, by certified mail, of the board's intention to strike a person's name from the registration list is two-fold: (1) to provide an elector with a reasonable opportunity to prevent his disfranchisement by offering proof that he had not been convicted of the disqualifying offense, and (2) to apprise an elector of the fact of his disqualification, thus providing him an incentive to seek the restoration of his right to vote. See generally § 17-3-10 [now § 17-3-31] (`restoration of right to vote upon pardon'; specific statutory provision for reinstatement of voting rights upon submission of a copy of the pardon document).
 "However, there is no authority for [the competing candidate's] contention that parties who are disqualified from voting under § 182[, Ala. Const. 1901,] nonetheless retain their right to vote until they are notified pursuant to § 17-4-132 that the board intends to remove their names from the registration list. Section 182 appears to be the sole authority for determining who has a right to vote. Section 17-4-132 merely provides the board of registrars with a method of purging the voter registration list that complies with due process; specifically, it protects those citizens whose names the board has selected, erroneously, for removal from the voter registration list, by giving those citizens an opportunity to contest the removal of their names. The presence or absence of a person's name on the voter registration list does not necessarily determine the right to vote."[3]
628 So.2d at 533-34 (footnote omitted). Justice Maddox concurred specially in Williams, writing that persons whose names appear on a voter's list should be entitled to vote until the procedure set forth in § 17-4-132 for removing names have been followed, because § 17-4-132, by setting up a procedure to remove a person's name from a voter's list because of a felony conviction, is designed to guarantee a registered voter who has been convicted of a felony that measure of due process required by the United States Constitution. Justice Adams dissented, writing:
 "The primary purposes of the notice requirement are to provide an elector with a reasonable opportunity to prevent his disenfranchisement and to apprise an *Page 683 
elector of the fact of his disqualification, thus providing him an incentive to seek the restoration of his right to vote. One does not seek a remedy until he is made aware of a deprivation. It is not unreasonable to assume that a significant number of voters are unaware of this particular consequence of a felony conviction — especially when they are not apprised of it, as the statute requires. The board, in failing to provide either prepurgation or postpurgation notice — in patent violation of the provisions and purpose of the statute — discourages the discovery of the deprivation and the pursuit of a remedy."
628 So.2d at 539-40. Although Long urges this Court to adopt the views of the special writings in Williams, we believe the majority in Williams was correct. The reason behind disenfranchising convicted felons is to preserve the purity of the ballot box, rather than to inflict an additional injury on a person convicted of a felony. A "criminal record" is one of the "factors which a State may take into consideration in determining the qualifications of voters." Lassiter v.North-ampton County Bd. of Elections, 360 U.S. 45, 51,79 S.Ct. 985, 3 L.Ed.2d 1072 (1959) (comparing the constitutionality of literacy requirements with the constitutionality of disenfranchising voters based on criminal records). The principle "that a convicted felon may be denied the right to vote" remains "unexceptionable." Romer v.Evans, 517 U.S. 620, 634, 116 S.Ct. 1620, 134 L.Ed.2d 855
(1996) (although some voting restrictions are unconstitutional, a person convicted of a felony can be excluded from voting). Alabama has the right to deny a convicted felon the right to vote, and the mere presence of a person's name on a voter-registration list does not necessarily determine the right to vote.
Long argues that the trial court erred in throwing out what he says were numerous legal absentee ballots cast for him. Specifically, Long contends that the trial court erred in throwing out 38 votes on the grounds that certain absentee voters did not properly complete the application or affidavit or that the voters gave inconsistent reasons for voting by absentee ballot. Long also contends that the trial court erred in discounting 96 absentee ballots based on an improper address. Long fails to cite to any portion of the 18-volume record in support of the underlying facts regarding these absentee ballots. Rule 28(a)(10), Ala. R.App. P., requires that an argument in an appellant's (or cross-appellant's) brief contain "citations to the cases, statutes, other authorities, and parts of the record relied on." Long cites Eubanks v. Hale,752 So.2d 1113 (Ala. 1999), in support of this argument, for the proposition that a person must not be disenfranchised when he has made an honest effort to comply with the law and in that effort has substantially complied with the statutory mandates. It is not the duty of this Court to undertake to link Long's legal argument with the bare factual allegations he offers in support of that argument. "`[W]here no legal authority is cited or argued, the effect is the same as if no argument had beenmade.'" Steele v. Rosenfeld, LLC, 936 So.2d 488,493 (Ala. 2005) (quoting Bennett v. Bennett,506 So.2d 1021, 1023 (Ala.Civ.App. 1987)). "[I]t is neither this Court's duty nor its function to perform an appellant's legal research."City of Birmingham v. Business Realty Inv. Co.,722 So.2d 747, 752 (Ala. 1998).
Last, Long argues that the trial court lacked the authority to order a runoff election because the time for holding a "runoff," i.e., the third Tuesday following the regular election, § 11-46-55, Ala. Code 1975, has passed. Long states in his brief: *Page 684 
 "Needless to say, the third Tuesday after the general election has long since passed. In fact, that date was over two years ago. Therefore the statute does not allow a `run-off under these circumstances. . . . [I]t is not established what is to take place when there is not a majority vote when judgment is rendered concerning the outcome of an election contest 2 years after the regular election."
(Long's brief pp. 17-18.)
"The fundamental rule of statutory construction is that this Court is to ascertain and effectuate the legislative intent as expressed in the statute. . . . In this ascertainment, we must look to the entire Act instead of isolated phrases or clauses. . . ." Darks Dairy, Inc. v. Alabama DairyComm'n, 367 So.2d 1378, 1380 (Ala. 1979). In construing statutes, we may glean legislative intent from the language used, the reason and necessity for the legislative act, and the purpose sought to be obtained. Bama Budweiser of Montgomery,Inc. v. Anheuser-Busch, Inc., 611 So.2d 238 (Ala. 1992). Courts do not interpret statutory provisions in isolation, but consider them in the context of the entire statutory scheme.Siegelman v. Alabama Ass'n of School Boards,819 So.2d 568 (Ala. 2001). Where more than one Code section is involved, each should be construed in harmony with the other Code sections then in effect, so far as is practical. Kinard v.Jordan, 646 So.2d 1380 (Ala. 1994).
At the time pertinent to the appeal, § 11-46-55(d), Ala. Code 1975, provided:
 "d) If no candidate receives a majority of all the votes cast in such election for any one office or offices for the election to which there were more than two candidates, then the municipal governing body shall order a second or `runoff election to be held on the third[4] Tuesday next thereafter following the regular election, at which election the two candidates having received the most and the second most votes, respectively, shall be candidates, and the person receiving the highest number of votes for that office in the runoff election shall be declared elected. If only two candidates are standing for election for any one office or offices and neither candidate receives a majority, then the municipal governing body shall order a second or `runoff election to be held on the third[4] Tuesday next thereafter following the regular election, at which election the two candidates shall be candidates, and the person receiving the highest number of votes for that office in the runoff election shall be declared elected. In the event one of the candidates for a particular office in the runoff election withdraws, then there need not be a second election to fill the office nor shall the name of either the party so withdrawing or the remaining candidate be printed on the ballot of any second election held under this article. This second election shall be held by the same election officers who held the first election and at the same places the first election was held. If there should be a tie vote cast at any runoff election, then in that event the tie shall be decided by the municipal governing body. A vote for a particular candidate by a majority of those members eligible to vote of the governing body shall be necessary to decide the election in his or her favor. The municipal clerk shall file a copy of each certificate of election in the office of the judge of probate of the county in *Page 685 
which the city or town is situated, and the judge shall file the certificate in the same manner that he or she files the declaration of the result of elections to county offices."
Section 11-46-69(b) provides that any municipal-election contest must be commenced within five days after the result of the election is declared and that the contest must be instituted in the manner prescribed in § 17-15-29 (now § 17-16-56), and except as otherwise provided, all proceedings relative to municipal-election contests shall be governed by the provisions of §§ 17-15-20 through -35 and §§ 17-15-50 through -63.[5]
Section 11-46-70 addresses the trial of a municipal-election contest. Section 11-46-70 contains four parts, each setting out a scenario involving a contested election:
 "If, on the trial of the contest of any municipal election, it shall appear that any person other than the one whose election is contested, received or would have received, had the ballots intended for him and illegally rejected been received, the requisite number of votes for election, judgment must be entered declaring such person duly elected, and such judgment shall have the force and effect of investing the person thereby declared elected with full right and title to have and to hold the office to which he is declared elected.
 "If it appears that no person has or would have had, if the ballots intended for him and illegally rejected had been received, the requisite number of votes for election, judgment must be entered declaring this fact, and such fact must be certified to the municipal governing body and the vacancy in the office, election to which had been contested, shall be filled in the manner prescribed by law for filling the vacancy in such office.
 "If the person whose election is contested is found to be ineligible to the office, judgment must be entered declaring the election void, and the fact must be certified to the municipal governing body. The vacancy in such office shall be filled in the manner prescribed by law.
 "If the party whose election is contested is found to have been duly and legally elected, judgment must be entered declaring him entitled to have and to hold the office to which he was so elected."[6]
Part one of § 11-46-70 involves a situation in which two candidates are involved in an election contest, and following the trial the judge determined that the candidate who had been declared the winner did not receive the highest number of votes. Part two applies to those situations where, in an election contest, the judge ultimately determines that, after tallying the legal votes cast in an election that a tie vote results. SeeJacobs v. Ryals, 401 So.2d 776 (Ala. 1981). Part two also applies where more than two candidates are involved, and no one candidate receives a *Page 686 
majority of the votes. See Ex parte Vines, 456 So.2d 26
(Ala. 1984). Part three involves ineligibility to hold the office to which a candidate has been elected, and part four applies in an election contest where the trial judge determines that the declared winner did receive the majority of legal votes cast.
In the present case, the original mayoral election was held on August 24, 2004, and Long was declared the winner on August 26, 2004. Subsequently, Bryant timely filed a contest of the election, pursuant to § 11-46-69, on August 30, 2004. Three candidates were involved in the election, and no candidate received a majority of the votes following the trial of the election contest. Long appears to argue that the mere passage of time as a result of the election contest prevents a runoff election. However, an election contest is part of the statutory election process as set out by the legislature, and the statutes address deficiencies or irregularities that may occur in casting ballots. Following the correct count of votes, a runoff election between the top two of the three candidates involved is properly ordered after "no person has or would have had, if the ballots intended for him and illegally rejected had been received, the requisite number of votes for election" under § 11-46-70. We note it would render an election contest meaningless if the three-week time limit for holding a runoff election set out in § 11-46-55(d), as it read at the time of the election here, barred a runoff election following an election contest where no one candidate received a majority of the votes. In a three-week time limit, there would never be enough time to contest an election, conduct discovery, and complete a trial.[7] Under Long's argument, any time an election was contested and no one candidate had a majority of the votes, there would be a vacancy in the office and a vacancy in a class 8 municipality, like Marion, would be filled by the city council. Certainly, that result was not the intent of the legislature when it provided for timely runoff elections in § 11-46-55(d).
 Conclusion
The judgment of the trial court ordering a runoff election between Long and Bryant is affirmed.
AFFIRMED.
COBB, C.J., and SEE, LYONS, WOODALL, STUART, SMITH, PARKER, and MURDOCK, JJ., concur.
[1] It appears that the trial court has counted three ballots — exhibits number 40, number 225, and number 238 — twice. Although it noted in category 6 that these three ballots were covered elsewhere, the total for category 6-10 — seems to include them. According to our calculations, the total votes for category 6 should be 7, making the total number of votes for Long 970.
[2] Section 177(b), Ala. Const. 1901, provides: "No person convicted of a felony involving moral turpitude, or who is mentally incompetent, shall be qualified to vote until restoration of civil and political rights or removal of disability." Whether the felonies at issue involved crimes of moral turpitude has not been raised.
[3] Article VIII, § 182, Ala. Const. 1901, was repealed by Amendment No. 579, which also repealed former § 177 and added current § 177.
[4] Section 11-46-55 was amended effective April 13, 2006; among nonsubstantive changes, the amendment substituted "sixth" for "third" in two places.
[5] Following the enactment of Act No. 2006-570, Ala. Acts 2006, §§ 17-15-20 through -35 have been reordered as §§ 17-16-47 through -62; §§ 17-15-50 through -63 have been reordered as §§ 17-16-63 through -76.
[6] We note that the first and second parts of § 11-46-70
contain the phrase "illegally rejected" votes. Although § 11-46-70 uses the phrase "illegally rejected" votes, an election contest would include both "illegal votes" that were received and the "rejection of any legal votes." See § 17-15-21 (now § 17-16-48) (addressing the testimony permitted in election contests). This is so because § 11-46-70 should be read in pari materia with § 17-15-21, as § 11-46-69(b) provides that contests in municipal-election proceedings are governed by "Articles 2 and 3, Chapter 15, Title 17 of this Code," except as otherwise provided.
[7] In 2006, the legislature increased the time for a runoff election from three weeks to six weeks. See note 4. However, six weeks is still not enough time in which to contest an election result, conduct discovery, and complete a trial.