628 So.2d 531 (1993)
Curtis WILLIAMS
v.
John T. LIDE.
John T. LIDE
v.
Curtis WILLIAMS.
1921020, 1921023.
Supreme Court of Alabama.
October 8, 1993.
*533 Collins Pettaway, Jr., and J.L. Chestnut, Jr. of Chestnut, Sanders, Sanders & Pettaway, P.C., Selma, for appellant/cross-appellee.
John W. Kelly III, Selma, for appellee/cross-appellant.

On Application for Rehearing
PER CURIAM.
This Court's opinion issued August 23, 1993, is withdrawn, and the following is substituted therefor:
Rev. Curtis Williams appeals and John T. Lide conditionally cross-appeals from a judgment in an election contest brought by Lide. Lide and Williams competed with one another for election to the Dallas County Commission, district 2. According to the votes counted by officials on the evening of the election, November 3, 1992, Williams received the most votes: 2,269 to Lide's 2,265.
On November 17, 1992, Lide filed an election contest, alleging:
"(1) that illegal votes were given to and counted for Williams; (2) that legal votes for Lide were unlawfully rejected; (3) that there was malconduct, fraud, or corruption involved in the election; and (4) that there was miscalculation, mistake, or misconduct in counting and tallying of votes by election officials."
On April 9, 1993, the trial court entered a judgment for Lide, based on its finding that Lide had received the highest number of legal votes cast on November 3, 1992. The trial court counted 2,272 legal votes for Lide and 2,262 legal votes for Williams.
The principal issues raised by Williams on appeal pertain to: (1) the voting rights of convicted felons; (2) the legality of certain challenged votes; (3) the legality of certain absentee votes; and (4) the trial court's exclusion of the proffered testimony of Mary James.

I. CONVICTED FELONS
Ala. Const. of 1901, art. VIII, § 182, disqualifies a person from voting who has been convicted of a crime punishable by imprisonment in a penitentiary. The purpose of disfranchising a person who has been convicted of a felony is "to preserve the purity of the ballot box rather than to inflict an additional penalty on the offender." 29 C.J.S. Elections § 33, n. 10 (1965). One who has been disfranchised by reason of conviction of a disqualifying crime may seek restoration of the right to vote, by pardon. Ala.Code 1975, § 17-3-10.
At trial, Lide proved that eight persons who had voted in the November 3, 1992, election for the Dallas County Commission, district 2, had been convicted of a felony, for which they were sentenced to a penitentiary, and had not had their voting rights restored. Accordingly, the trial court rejected those persons' votes.
Williams contends that those eight people were entitled to vote, because the board of registrars had not notified them that their names had been removed from the voter registration list. Ala.Code 1975, § 17-4-132, requires the board of registrars to notify, by certified mail, each person convicted of a disqualifying offense that the board intends to strike that person's name from the voter registration list. Section 17-4-132 also provides that "Any person whose name is stricken from the list may appeal from the decision of the board...."
We determine that the legislative intent for requiring notice, by certified mail, of the board's intention to strike a person's name from the registration list is two-fold: (1) to provide an elector with a reasonable opportunity to prevent his disfranchisement by offering proof that he had not been convicted of the disqualifying offense, and (2) to apprise an elector of the fact of his disqualification, thus providing him an incentive to seek the restoration of his right to vote. See generally § 17-3-10 ("restoration of right to vote upon pardon"; specific statutory provision for reinstatement of voting rights upon submission of a copy of the pardon document).
However, there is no authority for Williams's contention that parties who are disqualified from voting under § 182 nonetheless retain their right to vote until they *534 are notified pursuant to § 17-4-132 that the board intends to remove their names from the registration list.[1] Section § 182 appears to be the sole authority for determining who has a right to vote. Section 17-4-132 merely provides the board of registrars with a method of purging the voter registration list that complies with due process; specifically, it protects those citizens whose names the board has selected, erroneously, for removal from the voter registration list, by giving those citizens an opportunity to contest the removal of their names. The presence or absence of a person's name on the voter registration list does not necessarily determine the right to vote.
Lide proved that the eight persons in question were disqualified from voting under § 182; accordingly, the trial court properly rejected the votes cast by those persons.
II. CHALLENGED VOTERS
"If an elector's name is not on the voting list, election officials should not permit him to vote unless he presents a certificate from the Board of Registrars or unless he votes a challenged ballot. Section 17-4-127, Code of Alabama (1975). A challenge to an elector's vote may be made by any election inspector or qualified elector who knows or suspects that a person who is not duly qualified to vote will attempt to cast a ballot. If an elector has been challenged, election officials are not supposed to allow the challenged voter to cast a ballot until he takes an oath affirming his right and entitlement to vote [on the form set forth in Ala.Code 1975, § 17-12-3,] and he identifies himself in the manner set out in [§ 17-12-4]."
Hawkins v. Persons, 484 So.2d 1072, 1073 (Ala.1986). Section 17-12-3 requires that a challenged elector's oath be administered by an election inspector. "If a challenged elector subscribes to the oath and properly identifies himself, his ballot must be received and counted as if he had not been challenged." Hawkins, 484 So.2d at 1073.
In this election contest, the parties contested 71 challenged ballots cast in district 2, Dallas County, Alabama, on November 3, 1992. The grounds for contesting the votes were generally two: (1) the voter did not reside in district 2; or (2) the voter's oath was deficient because it was not signed by an election inspector or did not adequately identify the voter's place of residence. Pursuant to this Court's holding in Hawkins, the trial court permitted challenged voters whose oaths were defective as a result of mistakes of election officials to testify at trial to cure those defects. See Hawkins, 484 So.2d at 1074 (citing Pope v. Howle, 227 Ala. 154, 149 So. 222, 225 (1933)). After the parties had completed their presentation of evidence, the court privately compared the challenged voters' ballots to their oaths and to the evidence. Then, on April 9, 1993, the trial court issued a final order, listing by polling place, not by individual voter (so as to preserve the privacy of each citizen's vote), the number of challenged votes accepted and in whose favor it had counted those votes.
In reviewing the trial court's findings of fact in this election contest, we apply the same standard used by appellate courts when the trial court in a nonjury case has taken a material part of the evidence through ore tenus testimony; that is, we will not disturb the trial court's findings of fact unless those findings are plainly and palpably wrong and not supported by the evidence. Mitchell v. Kinney, 242 Ala. 196, 200, 5 So.2d 788, 797 (1942).

A. Union National Guard Armory

Twenty-six electors voted challenged ballots at the Union National Guard Armory polling place. Through inadvertence, polling officials failed to count any of those ballots. The ballots contained 19 additional votes for Lide, 5 additional votes for Williams, and 2 ballots with no vote for a member of the Dallas County Commission, district 2. The vast majority of electors who cast challenged ballots at Union had their oaths administered *535 by a clerk at the polling place, not by an election inspector as § 17-12-3 requires. Accordingly, the parties presented testimony from 19 of those electors in order to cure defects in their oaths.
In its final order, the trial court stated that it had considered 21 of the 26 challenged ballots cast at Union and that, of those, it had counted 16 votes: 14 for Lide and 2 for Williams. The court stated that the five ballots considered and rejected by it were rejected because "the voters did not live in district 2 or their oaths were insufficient."
Williams contends that the trial court acted improperly in refusing to consider five of the challenged ballots cast at Union. We can infer from the record that the five challenged ballots not considered by the trial court were not considered because the oaths of those voters were defective and the voters did not testify at trial to cure the defects. Thus, under § 17-12-3, the trial court's decision not to consider those ballots was proper.
Williams also contends that the trial court erred in rejecting five of the challenged votes of voters who testified at trial. Only three of those rejected votes were for Williams.[2] A review of the record reveals that one of the five persons who cast challenged votes for Williams supplied an insufficient address on her oath, and, although she testified at trial, her testimony did not prove that she lived in district 2. Another person who cast a challenged vote for Williams identified her signature on an oath, but stated that she did not remember reading the oath and did not remember the inspector asking her to swear to the information therein. A third person who cast a challenged ballot for Williams testified that he was registered to vote, but that he had no voter-registration card in his possession and could not remember when he had registered, although he believed that it was more than 10 years before the election. Thereafter, he stated that he voted for the first time (by challenged ballot) in the November 1992 election.
Under the ore tenus rule, the testimony of these three witnesses supports the trial court's finding that three challenged votes for Williams were due to be rejected.

B. Orrville

The trial court reviewed 23[3] challenged ballots cast at the Orrville polling place. Twenty of those voters who cast challenged votes testified in an effort to cure defects in their oaths. In its final order, the trial court stated that 12 of the challenged votes cast at Orrville were legal and that they were counted for Williams. The trial court further stated that it had excluded the remaining challenged votes for the following reasons: (1) one voter testified under oath that he knew a reason that he should not be allowed to vote; (2) one voter was not registered; (3) two voters had no recollection of voting; (4) three voters had been convicted of felonies; and (5) several voters' oaths were insufficient and were not cured by testimony.
Williams argues that the trial court erred in rejecting the five challenged votes from Orrville that were not cast by convicted felons. However, the evidence in the record supports the trial court's findings that those five challenged votes were due to be rejected for the reasons stated in the trial court's order.

C. Safford

Seven electors cast challenged ballots at the Safford polling place, and three of those voters testified at trial in an effort to cure defects in their oaths.[4] The trial court found that only one of those voters who had testified had cured defects in his oath.
Williams argues that he should have received five more votes from Safford. The record reveals that two of challenged voters from Safford who did not testify did not complete a proof of identity as required by § 17-12-4; therefore, their votes were properly *536 rejected. Further, two of the challenged voters were convicted felons whose votes were properly rejected. As for the three remaining challenged voters, Lide presented evidence that two of them had never registered to vote in Safford and that one of them had moved from Safford prior to November 1992. This evidence supports the trial court's finding that Williams should receive only one challenged vote from Safford.

III. ABSENTEE VOTERS
Election officials rejected several absentee ballots cast in the November 3, 1992, election, because of deficiencies in the affidavits required to be filed by those absentee voters. Williams argued to the trial court that 13 absentee ballots were erroneously rejected by election officials. In reviewing those absentee ballots and accompanying affidavits, the trial court stated that it was adhering to the factors adopted by this Court in Wells v. Ellis, 551 So.2d 382 (Ala.1989), for determining whether an absentee vote complies with Ala.Code 1975, § 17-10-1 et seq. (the statutory authority for absentee voting, which sets forth the manner for such voting). Those factors are:
(a) that the voter was not guilty of "fraud, gross negligence, or intentional wrongdoing";
(b) that the voter substantially complied "with the essential requirements of the absentee voting law"; and
(c) that any irregularities in the vote do not "adversely affect the sanctity of the ballot and the integrity of the election."
551 So.2d at 384 (quoting Bolden v. Potter, 452 So.2d 564, 566 (Fla.1984), and citing Boardman v. Esteva, 323 So.2d 259, 263 (Fla. 1975)).
Ala.Code 1975, § 17-10-7, provides that an affidavit must accompany the ballot of each absentee voter, and it sets forth the form for that affidavit. Although Wells stands for the proposition that an absentee voter's affidavit need not be identical to the form contained in § 17-10-7, under Wells the affidavit must comply substantially with § 17-10-7 and its irregularities must not "adversely affect the sanctity of the ballot and the integrity of the election." To fulfill these requirements from Wells, the trial court admitted into evidence only those absentee ballots that were accompanied by an affidavit containing the voter's (1) place of residence, (2) reason for voting absentee, and (3) signature. However, if an absentee voter's affidavit lacked any of those three elements, the trial court permitted the voter to testify at trial to supply the missing elements.
After reviewing the 13 absentee voters' affidavits submitted by Williams, the trial court admitted seven into evidence based solely upon its findings that those affidavits met the court's three-element test devised for testing the Wells factors. Thereafter, Williams presented testimony from four of the six voters whose affidavits were lacking certain elements. The trial court admitted all four of those voters' affidavits into evidence.
In its final order, the trial court stated that 9 additional votes, cast absentee, should be counted for Williams. The court rejected two of the 11 ballots admitted into evidence, stating that "one voter did not make application for an absentee ballot and ... someone else voted for her; [and] [t]he other voter, according to her testimony, simply laid her ballot down and did not seal it in the envelope to protect its integrity."
Williams argues that the trial court erred in rejecting two votes from among the 11 absentee ballots and accompanying affidavits in evidence. In reviewing the trial court's findings as to this issue, we are bound by the ore tenus rule. Mitchell, 242 Ala. at 200, 5 So.2d at 797. The evidence in the record supports the trial court's finding that two absentee votes were due to be rejected for the reasons given by the trial court in its final order.
Williams also argues that the trial court acted improperly in refusing to admit into evidence the affidavits of two absentee voters that contained no address. Those were the two voters who did not testify at trial. Essentially, Williams argues that the trial court should not have reduced Wells to a three-element test, because, in doing so, Williams says, it failed to consider the individual *537 circumstances of each voter. Williams contends that the place-of-residence element, deemed necessary by the trial court, was unnecessary because, he says, to obtain an absentee ballot the voter must establish his place of residence.
After reviewing the absentee affidavits presented by Williams, we conclude that the three-element test devised by the trial court was the most lenient test it could have used, under the circumstances, to determine whether affidavits were in substantial compliance with § 17-10-7 and whether any irregularities in them would "adversely affect the sanctity of the ballot [or] the integrity of the election." By allowing Williams to present testimony from absentee voters whose affidavits lacked the three elements deemed necessary, the trial court went a step further than it had to. Had the trial court been any more lenient, it would have effectively abolished § 17-10-7 and, necessarily, would have compromised the integrity of the election process. Accordingly, the trial court acted properly in refusing to admit into evidence absentee ballots lacking an address.
At trial, Lide did not argue that election officials had erroneously rejected any absentee votes in his favor. He did, however, contest the legality of two absentee votes. Election officials counted those two votes for Williams; however, at trial, both of the voters testified that a man came to their home prior to the November election and told them that he would assist them in voting by absentee ballot. The voters testified that they gave the man their names, addresses, and Social Security numbers. They further testified that the man told them that they would receive absentee ballots in the mail; however, they said, they never received or cast any absentee ballots and never told the man for whom they intended to vote. When shown affidavits allegedly signed by them, they testified that the signatures thereon were not theirs.
The trial court found that the two voters did not vote their absentee ballots; accordingly, it deleted two absentee votes from Williams's total. Although Williams argues that the trial court's finding was erroneous, that finding is supported by the evidence.

IV. TESTIMONY OF MARY JAMES
During the trial, Ed Vancil, one of three members of the Dallas County Board of Registrars, testified for Lide regarding the computer records of registered voters in Dallas County. Vancil testified that he was the only member of the board trained to operate the computer and that he was, therefore, responsible for maintaining the computer records. Thereafter, Williams, during his case in chief, attempted to call Mary James to testify that as part of her duties as a clerk in the Dallas County probate judge's office she made entries on the computer records of registered voters when "instructed to do so by various authorities and ... when the board of registrars [was] not in session."
Upon Lide's objection to James's testimony, the trial court determined that the best evidence as to the computer records of registered voters would be a computer-generated, voter registration list. It further determined that Vancil, as a member of the board of registrars, and not James, was the appropriate person to generate the list, and it ordered that he do so. Williams argues on appeal that the trial court erred in concluding that Vancil was the appropriate person to generate the list of registered voters.
A trial court has great discretion in determining the admissibility of evidence, and its rulings will not be reversed on appeal absent an abuse of discretion. Williams v. Hughes Moving & Storage Co., 578 So.2d 1281, 1285 (Ala.1991); Roberts v. Public Cemetery of Cullman, Inc., 569 So.2d 369, 373 (Ala.1990).
Sections 17-4-129 and 17-4-130 establish the board of registrars as the appropriate entity to prepare a list of all qualified and registered electors. Mary James testified, regarding her involvement in entering names on the computer-generated voter list, that she received instructions from the Dallas County Commission and from the board of registrars. She also acknowledged that the probate judge derives the voting list from the board of registrars. Accordingly, the trial court did not abuse its discretion in ruling that Vancil should generate the computer *538 list of registered voters and that the list he generated should serve as the best evidence of the computer records of registered voters in Dallas County.
Williams also argues that the trial court abused its discretion by excluding James's testimony, because, Williams says, it was offered to impeach Vancil and was proper for that purpose. Although Williams may have offered James's testimony to impeach Vancil, he elicited no testimony from James to establish any grounds for impeachment. In Shepherd v. Southern Ry., 288 Ala. 50, at 60-61, 256 So.2d 883, at 892 (1970), this Court stated that "impeaching testimony" is "designed to discredit a witness" by showing "why faith should not be accorded to his testimony" and that it consists of evidence "attacking the character, motives, integrity, or veracity of the witness." The trial court did not abuse its discretion in excluding James's testimony, because it did not establish any of the grounds for impeachment.

CONCLUSION
Williams's remaining arguments (stated in his brief as arguments VI, VII, and VIII) are merely restatements of his four primary arguments addressed above.
In his brief, Lide states that he intended that his cross-appeal be conditioned on this Court's conclusion that one or more of Williams's appellate arguments had merit and resulted in his receiving more legal votes than Lide. Because we affirm the trial court's order, the condition on which Lide's arguments are predicated has not occurred; therefore, the cross-appeal is to be dismissed as moot.
1921020ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
1921023ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; DISMISSED AS MOOT.
HORNSBY, C.J., and HOUSTON, STEAGALL and INGRAM, JJ., concur.
MADDOX, J., concurs specially.
ADAMS, J., dissents.
MADDOX, Justice (concurring specially).
On the application for rehearing, I have reexamined my concurrence with the majority opinion and, after further study, I now concur specially for the following reasons.
On original deliverance, I thought that the majority was correct in holding that the trial judge properly rejected the votes of 10 voters on the ground that they had been convicted of felonies and were, therefore, disqualified under the provisions of § 182 of the Constitution. I can no longer agree with that holding. I have concluded that persons who have been convicted of a felony are entitled to vote unless their names have been removed from the list of registered voters in accordance with the procedure set forth in Ala.Code 1975, § 17-4-132:
"The board of registrars shall purge the registration list whenever it receives and confirms information that a person registered to vote in that county has died, become a nonresident of the state or county, been declared mentally incompetent, been convicted of any offense mentioned in section 182 of the Constitution since being registered or otherwise become disqualified as an elector. A person convicted of a disqualifying offense must be notified by certified mail of the board's intention to strike his name from the list. No person convicted of a disqualifying crime may be stricken from the poll list while an appeal from the conviction is pending. Notice of the names of all other persons proposed to be stricken from the list shall be published in some newspaper published in the county.
"On the date set in the notice, or at a later date to which the case may have been continued by the board, the board shall proceed to consider the case of such elector whose name it proposes to strike from the registration list and determine the same. Any person whose name is stricken from the list may appeal from the decision of the board, without giving security for costs, and a trial by jury may be had; and the board shall forthwith certify *539 the proceedings to the circuit clerk, who shall docket the case in the circuit court."
(Emphasis added.)
The right to vote is guaranteed by the Constitution of the United States, and a person whose name is stricken from a registration list and whose right to vote is thereby denied should be accorded due process of law. I believe that § 17-4-132 is designed to guarantee to a registered voter who has been convicted of a felony that measure of due process required by the Constitution of the United States by setting up a procedure to remove a person's name from a voter's list because of conviction of a felony. There could be several reasons why a person's name should not be removed from a voter's list because of the conviction of a felony. The conviction might be set aside on appeal, or the person convicted may have had his or her civil rights restored. An uncounseled prior conviction might not disqualify a person from voting, just as an uncounseled prior conviction cannot be used to support a finding of guilt or to enhance punishment under the Habitual Felony Offender Act. Ex parte Reese, 620 So.2d 579 (Ala.1993), citing Burgett v. Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967), and Ladd v. State, 431 So.2d 579, 580 (Ala.Crim.App.1983).
I believe that persons whose names appear on a voter's list would be entitled to vote until the procedure set forth in § 17-4-132 for removing their names from the voter's list is followed. In this case, the record shows that the names of the challenged voters had been removed from the list of qualified voters, without their having received the proper notice as provided for in the statute.
The provisions of § 182, in my opinion, are not self-executing, especially in view of the statutory requirements for removing from a voting list the name of a person who has been convicted of a felony; consequently, I cannot agree with the holding of the majority regarding the voters who had been convicted of felonies. Nevertheless, in view of the facts of this case, even the challenged ballots of those persons convicted of felonies would not have changed the result of the election.
ADAMS, Justice (dissenting).
I must respectfully dissent, because of that portion of the majority opinion tacitly approving the action of the board of registrars in perfunctorily disenfranchising felonelectors. The trial judge rejected the votes of eight electors whose names had been "purged" from the registration lists because of felony convictions. Although the record is not entirely clear on this issue, it appears to be undisputed that none of these electors had been notified by the board of registrars of its action, either before or after removal.
In this connection, Ala.Code 1975, § 17-4-132, provides in pertinent part:
"The board of registrars shall purge the registration list whenever it receives and confirms information that a person registered to vote in that county has died, become a nonresident of the state or county, been declared mentally incompetent, been convicted of any offense mentioned in section 182 of the Constitution ... or otherwise become disqualified as an elector. A person convicted of a disqualifying offense must be notified by certified mail of the board's intention to strike his name from the list. No person convicted of a disqualifying crime may be stricken from the poll list while an appeal from the conviction is pending....
"... Any person whose name is stricken from the list may appeal from the decision of the board, without giving security for costs, and a trial by jury may be had...."
(Emphasis added.)
The primary purposes of the notice requirement are to provide an elector with a reasonable opportunity to prevent his disenfranchisement and to apprise an elector of the fact of his disqualification, thus providing him an incentive to seek the restoration of his right to vote. One does not seek a remedy until he is made aware of a deprivation. It is not unreasonable to assume that a significant number of voters are unaware of this particular consequence of a felony convictionespecially when they are not apprised of it, as the statute requires. The board, in failing to provide either prepurgation or postpurgation noticein patent violation of the provisions and purpose of the *540 statutediscourages the discovery of the deprivation and the pursuit of a remedy.
The action of the trial court entirely eviscerates § 17-4-132. Because the "the right to vote is a fundamental right," Thomas v. Mimms, 317 F.Supp. 179 (S.D.Ala.1970) (citing Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)), such actions pose grave consequences for electors' due process guarantees. These consequences appear especially significant in view of evidence that none of these electors was notified of his disenfranchisement. The evidence suggests that noncompliance with § 17-4-132 in Dallas County is routine and pervasive.
I also dissent because of that portion of the opinion approving the trial court's rejection of the testimony of Mary James, Dallas County probate clerk. Both parties proffered testimony regarding the generation of computer records of registered voters. The trial judge allowed the testimony of Lide's witness, who was one of three Dallas County registrars, and disallowed the testimony of Williams's witness, the probate judge's clerk, because, he concluded, she was not an appropriate person to generate a computer list, and, consequently, was not qualified to testify to matters regarding the preparation and generation of the voter lists.
The trial court's conclusion is inconsistent with a number of sections of chapter 4 of Title 17 of the Codemost significantly, § 17-4-138, which provides in part:
"The judge of probate may employ such assistants and clerical help as may be necessary to complete and properly prepare the list of qualified electors which the judge of probate is required to furnish the election inspectors.... The duties of said clerk shall be to submit to the board of registrars revised election lists of said county by placing all persons in their proper ward or precincts and eliminating therefrom all deceased, nonresident and fictitious persons named upon said roll and those convicted of crime, and shall further attend to all clerical work of the board of registrars."
(Emphasis added.) The job description given in this section specifically designates, in my judgment, the probate judge's clerkin this case, Mary Jamesas the individual most competent to testify as to the preparation and production of a computer-generated registration list. The rejection of Williams's proffered witness represents, therefore, a clear abuse of discretion, necessitating a reversal of the judgment in this case.
For these reasons, I must respectfully dissent. I dissent from the majority's affirmance of the trial court's judgment, and I dissent from the denial of rehearing.
NOTES
[1] Our holding that the notice provision contained in § 17-4-132 does not supersede § 182, which disqualifies convicted felons from voting, does not consider the issue whether the fact that the notice required by statute was not given constitutes a separate federal or state cause of action. That issue has not been raised in this appeal.
[2] The other two rejected votes were for Lide, and Lide does not argue that the trial court erred in rejecting them.
[3] At one place in its order of April 9, 1993, the trial court mistakenly states that it reviewed 24 challenged ballots cast at Orrville. It reviewed 23.
[4] The trial court stated, erroneously, that only six challenged ballots were cast.