PER CURIAM.
Larry Fluker appeals from a judgment against him in an election contest filed by Pete Wolff III challenging Fluker’s election to the office of mayor of the City of Evergreen. We affirm.

Facts and Procedural History

On October 7, 2008, a runoff election in the mayor’s race was held in the City of Evergreen (“the City”). The two candidates were Wolff and Fluker, the incumbent. Fluker received 1,028 votes and Wolff received 1,026 votes. On October 14, 2008, the City certified the election results, and Fluker was declared the win *945 ner. On October 15, 2008, Wolff filed a contest of the election in the Conecuh Circuit Court. Wolff claimed that legal votes were offered and rejected, which if cast and counted, would have increased the number of legal votes in favor of Wolff to a number that exceeded the number of legal votes in favor of Fluker. Wolff also claimed that illegal votes were cast in favor of Fluker and that if those votes were not counted the number of legal votes in favor of Fluker would be reduced to less than the number of legal votes in favor of Wolff. On October 16, 2008, Fluker responded, claiming that illegal votes were cast in favor of Wolff and that legal votes in Fluker’s favor were rejected and that if both were taken into account his vote tally would still exceed Wolffs.
On October 20, 2008, Wolff filed a motion pursuant to §§ 17-16-45 and -46, Ala. Code 1975, for an examination of the ballots, documents, and election materials, which the circuit court granted. The circuit court set a hearing for December 22, 2008, and December 23, 2008. At the December hearing, Wolffs counsel indicated that he would be challenging persons who voted in the runoff election whose names were not on the list of registered voters maintained by the secretary of state’s office. Wolff had a voter list from the secretary of state’s office dated December 19, 2008. Wolff indicated that he would be challenging voters on several other grounds as well.
Wolff called Peggy Howell, the clerk for the City, as a witness at the hearing. Howell testified regarding the compilation of the voter list used by the City. Howell was asked about absentee-voter information on several voters.[1] Wolff presented the testimony of seven voters who cast votes in person on October 7, 2008, and three voters who voted by absentee ballot:
1. F.D. testified that he was registered to vote but that someone signed an application for him to vote by absentee ballot even though he signed the affidavit affirming that he was voting. F.D. testified that he did not know whom he voted for on his absentee ballot because someone had come to his home and asked him to vote.
2. T.M. testified that he voted in person in the runoff election. He stated that he voted for Fluker. On cross-examination, T.M. testified that he registered to vote on a Sunday but that he did not remember if he registered on September 21, 2008, or September 28, 2008.
3. C.H. testified that he voted in person in the runoff election. He stated that his birth date was correct on the secretary of state’s voter list that was shown to him. He stated that he voted in district four. C.H. testified that his address was on Main Street, but that the City’s list for district four showed a different address.
4. P.C. testified that she voted in person in the runoff election. She stated that the exhibit shown to her by *946 Wolffs counsel and identified as exhibit one (the secretary of state’s voter list) had the correct street for her address but an incorrect number. P.C. stated that she voted for Fluker. Wolffs counsel later stated that P.C.’s name was not on exhibit one.[2]
5. N.G. testified that she voted in person in the runoff election. She stated that when she went to vote, her name was on one list but not on another list so she was told to get an identification card from the board of registrars. N.G. stated that she obtained the card and voted. She stated that her address had changed from when she had originally registered to vote years ago as a result of a new emergency 9-1-1 system. Wolffs counsel stated that N.G.’s name was not on the secretary of state’s voter list.
6. E.R. stated that she voted in person in the runoff election. She stated that she was not on the voter list when she went to vote because she had married and the voter list had her listed under her maiden name. Wolffs counsel stated that neither E.R.’s maiden name nor her married name were on the secretary of state’s voter list.[3]
7. R.T. testified that he voted in person in the runoff election. He stated that he voted for Fluker. Wolffs counsel stated that R.T.’s name did not appear on the secretary of state’s voter list.
8. B.W. testified that she voted in person in the runoff election. Wolffs counsel indicated that B.W.’s name was not on the secretary of state’s voter list.
9. A.S. testified that he voted by absentee ballot and that he voted for Fluker A.S.’s application indicated as his reason for voting absentee that he would be out of town, but his affidavit indicated that he was working a shift that kept him from voting on election day.
10. K.C. testified that he voted by absentee ballot and that he stated on his application that he would be working a shift that would not permit him to vote. K.C. stated in his affidavit that he would be out of the county on election day.
Fluker presented the testimony of two voters regarding their addresses and two voters regarding the date they registered to vote. Next, Wolff challenged 39 absentee voters to whom a subpoena to testify had not been issued. The overwhelming ground for challenging the absentee ballots was that the names of those 39 absentee voters were not on the secretary of state’s voter list dated December 19, 2008. Other reasons for the challenges included, among other things, voting in the wrong district of the City, questionable or incorrect addresses, postmark issues, residency issues, failure to have two witnesses or a notary on an affidavit, improper identification, questions regarding inconsistent signatures on affidavits and applications, and questions regarding inconsistent reasons for voting by absentee ballot. Wolff challenged several votes on more than one ground. Wolff also alleged that 106 additional voters were not on the secretary of state’s voter list.
Fluker challenged 28 absentee ballots that had been cast for Wolff. He chal *947 lenged 6 absentee voters for using improper identification; he challenged 5 absentee voters for problems with the postmarks on their envelopes; and he challenged 17 absentee voters for failing to state a reason for voting by absentee ballot. Next, Fluker called W.B. to testify regarding his residency. W.B. stated that he voted for Wolff. Fluker also called Patsy Chapman, a member of the Conecuh County Board of Registrars, as a witness. Chapman testified as to the compilation of the voter list for Conecuh County.
On March 26, 2009, the circuit court held a second hearing. At the outset of the hearing, the court indicated that the purpose of the hearing was to determine the duties and responsibilities of the secretary of state’s office in the runoff election.
Ed Packard, who is employed in the elections division of the secretary of state’s office, testified that each of Alabama’s 67 counties has a board of registrars and each of those boards has a computer system that is linked to the statewide voter-registration database in the secretary of state’s office. When a potential voter completes a registration form, the local board first determines if the potential voter is eligible to vote and, if so, that voter’s information is then entered into the computer system. The computer system aids the board in determining in what district a voter lives and where he or she votes. The secretary of state relies upon the local board in each county to maintain and update the list of registered voters.
Packard testified that the certified list of registered voters in a municipal election originates from the municipality, not from the secretary of state’s office. The secretary of state, in creating a statewide list of voters, does not input the records or edit the records; that is the job of each county’s board of registrars. Packard testified that the information input into the state’s computer system by the local board is done in “real time” so that the information is updated as soon as it is input. He stated that the secretary of state’s office did not produce voter lists except by request and that a list for Conecuh County for October 7, 2008, could not be retroactively “created” because any list printed after October 7, 2008, would include any information that was entered into the system after that date. Packard stated that a statewide voter list had been printed by request in August 2008 and that another one had been printed in December 2008. Packard noted that the state’s computer system had an activity log to show when changes and/or updates to a voter’s information were made by a board member. Packard was asked if the secretary of state could extrapolate from the December 2008 and the August 2008 lists to compile a list of registered voters on October 7, 2008. Packard stated in response:
“I have to think about exactly how we can provide it. Because one of the options we would have would be to go back and produce a list of everyone who had a registration date up to October 7, but if there were any changes, you know, it may not necessarily accurately reflect who was eligible for that city election. Theoretically, though, we could go in if we had a base point like the August list, you know, we could try to determine whether someone was changed. Given that there was a lot of heavy registration during that period, there could be a significant amount of clerical work that would need to be done. Although we might be able to talk to the vendor of the software to see if they could help us extract something that would be more on point.”
The three members of the Conecuh County Board of Registrars testified. All *948 three members testified as to the process of entering a voter’s information into the computer system linked to the secretary of state’s office. The testimony indicated that the board used its own computer, which was connected to the secretary of state’s computer, to register voters. The testimony indicated that, once the information is entered into the county’s computer, the same information is sent to the secretary of state’s computer. The testimony also indicated that no one may properly register less than 10 days prior to an election and still be eligible to vote in that election. The testimony indicated that the board registers the voter and that the City clerk determines if the voter’s address is within the municipal limits. When a city requests a list of voters for an upcoming municipal election, the county board sends the city a list of all the voters in the precincts that are within the municipal limits. Some of the precincts in Conecuh County include areas that are partially in the City and areas that are partially in the county but outside the City.
We note that one of the registrars was asked specifically about the registration date of T.M., who testified at the December hearing. The registrar indicated that T.M. had timely registered to vote on September 26, 2008. Next, Fluker presented the testimony of C.C. and K.C., both of whom voted by absentee ballot. C.C. stated that he voted by absentee ballot because he worked an 11-hour shift, and K.C. testified as to her residence.
On April 6, 2009, the circuit court entered the following order:
“This case is re-set for further hearing at 9:00 AM on April 17, 2009.
“The office of the Secretary of State of Alabama shall provide a copy of the list of qualified voters of Conecuh County as near as possible to the cutoff date for registration in the October 2008 Mayoral runoff for the City of Evergreen to Ms. Peggy W. Howell, Evergreen City Clerk.
“Ms. Howell will review this list and be prepared to testify at this hearing as to which voters voted in the runoff election and in which District and whether they voted in person or by absentee ballot. She shall also be prepared to testify as to whether they lived within the City limits and whether they lived in the District in which they voted.
“The Office of the Attorney General of Alabama shall provide Ms. Howell with a copy of any documents he had seized from the City following the runoff election which will assist Ms. Howell in making the determination set forth above.
“The Circuit Clerk shall issue a subpoena to Ms. Howell to appear at the hearing on April 17, 2009, duces tecum the above referenced documents.
“The Circuit Clerk shall issue a subpoena duces tecum also to the Office of the Secretary of State for the above referenced documents. This subpoena may be complied with by furnishing said documents to Ms. Howell and reporting to the Clerk that it has done so.
“The Circuit Clerk shall issue a subpoena duces tecum also to the Office of the Attorney General for the above referenced documents. The subpoena may be complied with by furnishing said documents to Ms. Howell and reporting to the Clerk that it has done so.
“In addition to the above subpoenas, the Clerk shall cause a copy of this Order to be served on both of the above offices.”[4]
*949 The hearing set for April 17, 2009, was reset for June 5, 2009. At the June 5, 2009, hearing, Wolff presented Howell’s testimony. Howell testified regarding whether certain voters had voted in the runoff election and whether those voters were on the list the secretary of state’s office had been ordered to create.[5] Howell was asked if she brought the absentee ballots cast in the runoff election with her to the hearing, to which she responded that she did not realize that the subpoena included the ballots. She stated that the ballots could be brought to the courtroom. Nothing in the record indicates that the ballots were ever brought to court, and the ballots were not entered into evidence.
Wolff also presented the testimony of a handwriting expert, Dr. Richard Roper, regarding signatures or “marks” in lieu of signatures on 22 applications for absentee ballots cast for Fluker and supporting affidavits. Those voters were: C.B., R.C., E.D., D.D., V.F., E.G., J.H., S.H., M.I., S.J., H.L., S.L., E.M., S.M., F.M., R.S., M.S., K.T, S.T, M.T, F.T., and N.W. Fluker’s counsel cross-examined Roper and objected to his testimony on the following grounds:
‘Tour Honor, I would move to exclude the testimony of Mr. Roper on the ground that he did not observe and was not present when any of these people gave or made the signatures that he examined. He did not take any sample writings from any of these folks in the usual way that it is done. And he did not examine the original documents and that his testimony for that reason is speculative. [Wolff’s counsel] should be required to call the actual voters and take their testimony about whether or not their signature [is] on those two documents or not before any of them are denied the right of all citizens to cast a vote.”
The circuit court denied the motion to exclude Roper’s testimony. Roper’s testimony indicated that in each instance the application for the absentee ballot and the supporting affidavit had been executed by different writers. Wolff then presented additional evidence regarding absentee voters and the testimony of L.T, who voted by absentee ballot.
On August 24, 2009, the circuit court entered an order finding that 31 illegal votes had been cast for Fluker and that 24 illegal votes had been cast for Wolff, making the vote tally 1,002 in favor of Wolff and 997 in favor of Fluker. The circuit court stated that Wolff had originally alleged that the names of approximately 400 voters who voted in the runoff election did not appear on the secretary of state’s voter list. However, after a list of registered voters produced by the secretary of state’s office dated October 6, 2008, was discovered, Wolff reduced the number of challenges for failure to appear on the secretary of state’s voter list to five. The circuit court noted that it informed that parties that ballots cast by voters who voted in the wrong district of the City and challenged by the parties would not be excluded on that ground. The court also informed the parties that it would not invalidate the ballots of voters who gave inconsistent reasons for voting by absentee ballot nor would it invalidate the ballots of voters who had inconsistent addresses or birth dates on their applications or affidavits.
With regard to the challenges to the absentee ballots brought by Wolff, the circuit court invalidated the ballots of 30 ab *950 sentee voters who had voted for Fluker on the following grounds: 2 ballots because the voters’ names were not on the secretary of state’s voter list; 18 ballots because a different person had executed the application for the absentee ballot and the supporting affidavit; 1 ballot because the same person not only signed the application and the affidavit, but also signed as a witness; 1 ballot because the voter was “incapacitated”; 1 ballot because there was no witnesses on the affidavit, nor was the affidavit notarized; 2 ballots because the means of identification used to vote absentee was not current; 8 ballots because of insufficient postmarks; 1 ballot because of a homestead exemption claimed outside the City; and 1 ballot because the voter’s residency was outside the City. Additionally, the circuit court excluded the vote of T.M., who voted in person on the day of the election, because he allegedly registered to vote after the 10-day cutoff for registration.
Fluker appeals, arguing that the circuit court erroneously disqualified two voters because their names were not on the voter list maintained by the secretary of state. He further argues that the circuit court wrongfully disqualified voters based on the following: (1) Wolffs failure to submit evidence of a voter’s “incapacity”; (2) the circuit court’s incorrect interpretation of the law of domicile; (3) inconsistent evidence regarding the date a voter registered; and (4) testimony of a handwriting expert in contradiction to the Alabama Rules of Evidence. Lastly, Fluker argues that there were no absentee ballots or copies of those ballots admitted into evidence; that there was nothing in the record to show that the parties entered into a stipulation as to how the absentee voters cast their ballots; and, therefore, that there is nothing to support the circuit court’s findings as to how these voters cast their ballots. Wolff did not cross-appeal.

Standard of Review

“An election contest is a statutory matter, and the statute governing the election must be strictly observed and construed. Watters v. Lyons, 188 Ala. 525, 66 So. 436 (1914).” Long v. Bryant, 992 So.2d 673, 680 (Ala.2008).
“In reviewing a trial court’s findings of fact in an election contest, we apply the same standard used by appellate courts when the trial court in a nonjury case has taken a material part of the evidence through ore tenus testimony; that is, we will not disturb the trial court’s findings of fact unless those findings are plainly and palpably wrong and not supported by the evidence.”
Williams v. Lide, 628 So.2d 531, 534 (Ala.1993).
“The [ore tenus] rule applies to ‘disputed issues of fact,’ whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence.” Reed v. Board of Trs. for Alabama State Univ., 778 So.2d 791, 795 (Ala.2000) (citing Born v. Clark, 662 So.2d 669, 672 (Ala.1995)).
“ ‘[W]here the evidence had been [presented] ore tenus, a presumption of correctness attends the trial court’s conclusion on issues of fact, and this Court will not disturb the trial court’s conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence.’ ”
Reed, 778 So.2d at 795 (quoting Raidt v. Crane, 342 So.2d 358, 360 (Ala.1977)). The ore tenus presumption is based on the trial court’s unique position to directly observe the witnesses and its “better opportunity to pass upon the credibility of their testimony.” Ex parte Pielach, 681 So.2d 154, 155 (Ala.1996).

*951
Discussion

Fluker, who was represented by different counsel at trial than on appeal, contends that nothing in the record shows for whom the absentee ballots were cast voted in the runoff election. He argues that under Rule 1002, Ala. R. Evid., the best evidence of how the absentee voters cast their ballots is the ballots themselves. He contends that under Rule 1003, Ala. R. Evid., photocopies of the ballots would have sufficed. Fluker argues that the attorneys’ recitation of matters not disclosed by the record cannot be considered on appeal. He further argues that, because there is no way to attribute any of the absentee ballots cast, there is nothing to support the circuit court’s invalidation of those votes and that, therefore, those votes subtracted from Fluker’s total vote tally should be returned to Fluker.
In response to this argument, Wolff states in his brief:
“Finally, Fluker submits that there is no evidence other than the charts submitted by the parties of how the absentee voters cast their votes. That is quite simply because the lawyers for the parties under the supervision of the Court looked at the absentee ballots and that is why the record likewise is devoid of any evidence of any challenge to how a person voted absentee. The voters that voted on site were all called to testify live and were required under statute to state how they voted. Code of Alabama § 17-16-42.”[6]
(Wolffs brief, p. 15.)
Fluker’s trial counsel did not object to the circuit court’s attribution of votes to absentee voters. Instead, it appears that trial counsel stipulated that the absentee ballots in question had been correctly attributed to Fluker and Wolff. It is well settled that this Court will not reverse a trial court’s judgment based on arguments not presented to it. Lloyd Noland Hosp. v. Durham, 906 So.2d 157 (Ala. 2005). Additionally, it is the appellant’s burden to offer the appellate court a record sufficient to support a reversal. Parker v. Williams, 977 So.2d 476 (Ala.2007). Fluker should have amended the record on appeal pursuant to Rule 10, Ala. R.App. P., to include the purported stipulation as to how certain absentee ballots were cast. Then, Fluker would have had to show that the stipulation as to those votes was in error. Accordingly, we cannot .say that the circuit court erred in its attribution of the votes cast by absentee ballots to Fluker and to Wolff.
Fluker argues that the circuit court erred in disqualifying two votes attributed to Fluker on the basis that those voters’ names were not on the secretary of state’s voter list. Fluker argues that the circuit court should have relied upon the City’s list of registered voters in determining who was eligible to vote in the runoff election.
At the outset, we note that municipal elections are held at times different from elections held by the State and counties; that a voter’s eligibility to vote in a municipal election may differ, e.g., concerning length of the voter’s residency in the municipality prior to the election; and that the physical location of the precinct at which the voter votes may be different for a municipal election. The provisions that govern municipal elections are set out at § 11-46-1 et seq., Ala.Code 1975. Title 17 of the Alabama Code governs primary, special, and general elections. Section 17-1-1 provides that in the event of a conflict, *952 the law governing municipal elections applies.[7] In response to the federal legislation entitled the “Help America Vote Act,” the Alabama Legislature amended its election laws, including § 17-4-33, Ala.Code 1975, which now provides that a computerized statewide voter-registration list is to be maintained by the secretary of state.
Section 17-4-88 provides, in pertinent part, as follows:
“The State of Alabama shall provide, through the Secretary of State, a nondiscriminatory, single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered by the Secretary of State, with advice from the Voter Registration Advisory Board and the President of the Alabama Probate Judges Association, which contains the name and registration information of every legally registered voter in the state. The computerized list shall comply with the following requirements:
[[Image here]]
“(9) It shall serve as the official voter registration list for the conduct of all elections.”
Section 11^46-36 provides:
“(a) The mayor or other chief executive officer of the city or town shall cause to be made a list of the qualified voters who reside within the corporate limits of such city or town and who are registered to vote regular ballots, dividing the same into separate alphabetical lists of the qualified voters of each ward where such city or town has been divided into wards and all qualified voters thereof vote at one box or voting machine, or dividing such list into separate alphabetical lists of voters authorized to vote at each respective box or voting machine if the list of qualified voters has been divided alphabetically and each alphabetical group assigned a box or machine at which to vote. He shall have such lists compared with the official list of electors qualified to vote during the current year on file in the probate office of the county in which the municipality is situated and shall certify on each list prepared pursuant to this section that it is a correct list of the voters who are qualified to vote regular ballots in the municipality, ward, ballot box, or voting machine to which it appertains. He shall have full access to all registration lists of the county for this purpose. A copy of each list so prepared shall be filed with the municipal clerk, who shall file and retain each such list as a public record in his office, on or before the third Tuesday in July before a regular municipal election. The clerk shall prepare a copy of the list of qualified voters authorized to vote at each of the respective polling places in the municipality, and, prior to the opening of the polls on election day, he shall furnish to the inspectors, or one of them, of each ballot box or voting machine at each polling place a copy of the list of qualified voters authorized to vote at the box or voting machine for which he was appointed an inspector. The clerk shall also publish the list of qualified voters authorized to vote at the ensuing election at least five days prior to the election by posting copies thereof in at least three public places in the municipality.”
It is well settled that in determining legislative intent:
*953 “Our inquiry is governed by settled principles of statutory construction:
“ ‘ “The fundamental rule of statutory construction is that this Court is to ascertain and effectuate the legislative intent as expressed in the statute. League of Women Voters v. Renfro, 292 Ala. 128, 290 So.2d 167 (1974). In this ascertainment, we must look to the entire Act instead of isolated phrases or clauses; Opinion of the Justices, 264 Ala. 176, 85 So.2d 891 (1956).” ’ ”
Bright v. Calhoun, 988 So.2d 492, 497 (Ala.2008) (quoting City of Bessemer v. McClain, 957 So.2d 1061, 1074-75 (Ala.2006), quoting in turn Darks Dairy, Inc. v. Alabama Dairy Comm’n, 867 So.2d 1378, 1380 (Ala.1979) (emphasis omitted)).
To determine legislative intent, the Court must first look to the language of the statute. If, giving the statutory language its plain and ordinary meaning, we conclude that the language is unambiguous, then there is no room for judicial construction. Ex parte Waddail, 827 So.2d 789, 794 (Ala.2001). Because § 17-1-1 expressly states that in the event of a conflict between the general-election laws and the municipal-election laws, the provisions of the municipal-election laws control the manner in which a municipality creates its voter list.
Other election statutes also support the legislature’s intent that municipalities create their own voter list. Only persons who have been residents of the municipality for 30 days or more are eligible to vote in municipal elections. § 11-46-38. Although persons can continue to register to vote up to 10 days before the election as provided in § 17-3-50, unless the person has been a resident of the municipality for 30 or more days, he or she may not vote in the municipal election. Additionally, municipalities have the authority to expand their corporate limits through annexation, §§ 11 — 42—1 through -187, and municipalities can reduce their corporate limits through de-annexation, §§ 11-42-200 through -213. The alteration of a municipality’s corporate limits affects eligible voters in a municipal election, and the determination of its corporate limits is peculiarly within a municipality’s control.
In accordance with the language of § 17-4-33, the secretary of state maintains a statewide list of registered voters. The testimony presented at the hearings indicates that the board of registrars in every county has a computer system linked to the statewide voter-registration database in the secretary of state’s office. When a potential voter fills out a registration form, the board of registrars determines if the potential voter is eligible, and that voter’s information is then entered into the computer system. The computer system aids the board in determining in what district a voter lives and the voting location or precinct where the voter votes in primary, special, and general elections. The secretary of state relies upon the board in each county to maintain and update the list. Municipalities in a particular county do not register voters for municipal elections. Citizens wanting to vote must register with the county board of registrars. Using the list provided by the county board of registrars, municipal officials prepare a list of registered voters for each election who reside inside the municipal limits.
Although we agree with Fluker’s argument that the City creates its own list of registered voters, we cannot say that the circuit court erred in disqualifying two votes for the reason that the persons casting the votes were not included on the secretary of state’s voter list. According to the circuit court’s order, the court relied upon a secretary of state’s voter list from October 6, 2008, and the runoff election *954 was held on October 7, 2008. The two voters’ names were on the City’s list, but they were not on the secretary of state’s list created just one day earlier. However, because the genesis of the secretary of state’s voter list is the information input by the county board of registrars, this discrepancy is incongruous unless those two voters (1) were registered voters at the time the City’s list was printed (presumably at some point after the 10-day cutoff for registering to vote in the runoff election), but whose names had, for whatever reason, been deleted from the statewide list of voters before the secretary of state’s list of October 6, 2008, was created, or (2) actually registered to vote on the day of the election and were somehow added to the City’s list. There is no evidence in the record that supports example (1) above at all, much less supporting the argument that the two voters had been -wrongfully deleted, nor does Fluker make such argument, and even if we assume example (2) to be true, it would be of no benefit to Fluker because the two voters would still be ineligible to legally vote in this election based on the 10-day cutoff. It is clear that a person can register to vote less than 10 days prior to an election, including a runoff election, even though that voter would be ineligible to vote in that election. The testimony indicated that the secretary of state’s voter list is maintained by the county board of registrars and that the registrars enter the information on the voter. When a municipal election is held, the board provides the municipality with the list of registered voters in the various precincts, and the municipality determines who among those voters resides within the municipal limits. Based on the record before us, there does not appear to be any reason for the secretary of state’s voter list to vary from the City’s list as to the names on the list. Accordingly, we cannot say that the circuit court erred in excluding the two votes Fluker challenges on that basis.
Fluker argues that the circuit court erred by relying on guardianship and protective proceeding papers, and letters of guardianship and conservatorship, to exclude the absentee vote of H.M., whose vote was excluded based on incapacity. Wolff challenged H.M.’s vote on several grounds, including that he was mentally incompetent, and H.M.’s vote was attributed to Fluker. Fluker argues that nothing in the papers submitted indicates that H.M. is mentally incompetent. The only indication of mental incapacity is the allegation of Wolffs counsel; the guardianship papers and letters of conservatorship admitted into evidence state only that H.M. is “incapacitated.” At the hearing, Wolff challenged H.M.’s vote on the ground that H.M. was mentally incompetent, on the ground that the same person who signed H.M.’s affidavit as a witness also witnessed the signatures of other persons who voted who may have been incapacitated and whose capacity was questioned, and on the ground that H.M. had inconsistent reasons for voting by absentee. In support of this challenge, Wolff presented guardianship papers and letters of conservatorship for H.M. along with H.M.’s affidavit, all of which were admitted into evidence without objection by Fluker’s trial counsel. In a brief submitted to the circuit court, Wolff’s counsel challenged H.M.’s vote on the grounds that H.M. was represented by a guardian'and that H.M. had inconsistent reasons on his application for an absentee ballot and on his affidavit. In his brief, Fluker’s trial counsel argued that H.M.’s ballot should not be disqualified on the ground that he gave inconsistent reasons on his application for an absentee ballot and on his affidavit. The circuit court excluded H.M.’s vote on the ground that he was incompetent. Because Fluker’s *955 trial counsel did not object to the admission of the guardianship papers and letters of conservatorship at trial or to sufficiency of proof of incompetency as set out in the letters, any error in the circuit court’s reliance on the papers or Wolffs counsel’s statements regarding incapacity was not preserved for appellate review. See Davis v. Southland Corp., 465 So.2d 397 (Ala.1985)(a party seeking to prevent the admission of evidence must object to the offering of that evidence because the failure to object at trial waives that objection).
Next, Fluker contends that the circuit court erred in its determination of the domicile of several voters. Specifically, Fluker argues that the circuit court erred in disqualifying the vote of W.M.H. W.M.H.’s absentee vote was attributed to Fluker, and Wolff challenged her vote on the ground that she resided outside the City. In support of his challenge, Wolff presented evidence indicating that W.M.H. had claimed a homestead exemption outside the City. As the contestant, Wolff had the burden of showing that W.M.H.’s vote was illegally cast. Wattman v. Rowell, 913 So.2d 1083, 1089 (Ala.2005) (“[I]t is the responsibility of a party seeking to have a vote excluded to make a prima facie showing that the vote was illegally east.”). Wolff did so, and the burden then shifted to Fluker to present evidence indicating that W.M.H.’s vote was legally cast. In other words, Fluker had to present evidence of W.M.H.’s intent to make the City her home, which he failed to do. See Harris v. McKenzie, 703 So.2d 309, 313 (Ala.1997)(holding that, in determining domicile in an election case, domicile is that place in which habitation is fixed, without any present intention of removing).
Next, Fluker argues that the circuit court erred in its determination of the residency of C.T., E.T., and J.C., because, he argues, the circuit court erred in accepting the testimony of L.T. as to those voters’ intent to reside in the City. Fluker challenged C.T.’s, E.T.’s, and J.C.’s votes because C.T. claimed a homestead exemption outside the City, and E.T. and J.C. were listed as residing at the same address as C.T. In response to the challenge, Wolff presented the testimony of L.T., C.T.’s wife. On appeal, Fluker argues that L.T. could not testify as to her husband’s, son’s, and stepson’s intent to reside in the City. However, Fluker’s trial counsel failed to object to L.T.’s testimony. Accordingly, we cannot consider whether the admission of L.T.’s testimony constituted error. It is well settled that a reviewing court cannot consider arguments made for the first time on appeal. CSX Transp., Inc. v. Day, 613 So.2d 883 (Ala.1993).
Fluker argues that the circuit court erred in not allowing T.M.’s vote to stand, on the ground that T.M. did not timely register to vote. T.M. testified that he voted in person during the runoff election. He stated that he voted for Fluker. On cross-examination, T.M. testified that he registered to vote on a Sunday, but that he did not remember if he registered on September 21, 2008, or September 28, 2008. Board of registrar members Patsy Chapman and Paula Brock testified that T.M.’s application was dated September 21, 2008, and that an employee “signed off’ on the application on September 26, 2008, but that T.M.’s name was not officially entered into the computer until September 29, 2008. Because there was conflicting evidence as to whether T.M. was registered to vote more than 10 days before the runoff election, we cannot say that the circuit court’s decision to exclude T.M.’s vote was plainly and palpably wrong. See Williams, 628 So.2d at 534 (“In reviewing the trial court’s findings of fact in this election contest, we apply the same stan *956 dard used by appellate courts when the trial court in a nonjury case has taken a material part of the evidence through ore tenus testimony; that is, we will not disturb those findings unless those findings are plainly and palpably wrong and not supported by the evidence.”).
Fluker argues that the circuit court erred in allowing the testimony of a handwriting expert to disqualify 18 votes cast for him by absentee voters.[8] Specifically, Fluker argues that, in order to make a comparison of handwriting, there must be evidence of a true and genuine signature as set out in Rule 44(j), Ala. R. Civ. P.
At trial, Wolff presented the testimony of Dr. Richard Roper, a handwriting expert. Roper’s testimony indicated that different persons signed the application to vote absentee and the affidavit in support of the application. The 18 votes excluded by the circuit court were attributed to Fluker and ultimately deducted from his total vote count. Fluker’s trial counsel objected to Roper’s testimony on the grounds that Roper did not observe any of the voters give or make the signatures he examined; that he did not take any sample writings from any of the voters; and that he did not examine the original documents. Fluker’s trial counsel also argued that the person contesting the ballots on the ground of handwriting should take the testimony of the voters before their votes are disqualified.
Section 17-11-4 provides that an absentee voter must “manually” sign his application to vote by absentee ballot.[9] Section 17-11-10 sets out the procedure for officials to determine whether the absentee voter signed or marked the affidavit and whether a notary public or two witnesses witnessed the voter’s signature on the affidavit. It is clear that § 17 — 11—4 and § 17-11-10 each require an absentee voter to sign both his or her application to vote by absentee ballot and his or her affidavit.[10] The first rule of statutory construction is to give effect to the intent of the legislature. If the language of the statute is unambiguous, then there is no room for judicial construction, and the clearly expressed intent of the legislature is to be given effect. Taylor v. Cox, 710 So.2d 406 (Ala.1998). Wolff presented expert testimony indicating that the signatures on the applications of these 18 absentee voters differed from the signatures on the supporting affidavits. Once Wolff presented evidence that the signatures differed, Fluker could have presented evidence to rebut the expert’s testimony, such as the testimony of the voters or testimony regarding health conditions that might have impacted the voter’s handwriting, as Fluker’s appellate counsel now suggests. However, Fluker’s trial counsel failed to present any evidence to rebut the testimony.[11] Accordingly, we cannot say that the circuit court exceeded its discretion in disqualifying the 18 votes from Fluker’s tally *957 based on the handwriting expert s testimony. We note that it does not appear that Rule 44, Ala. R. Civ. P., which concerns the validity of a single handwriting analysis, would apply in this case, and the facts in this case concern a comparison of two handwritings, where, by law, both documents had to be signed by the same person. If the handwriting expert had determined that the same person signed both the application and the affidavit, then Rule 44 would apply and an exemplar of the voter’s signature would be necessary to compare it with the signatures on the application and affidavit.

Conclusion

We have reviewed the record, and we cannot say that the circuit court’s decision was plainly and palpably wrong. The judgment is affirmed.
AFFIRMED.
LYONS, STUART, SMITH, BOLIN, PARKER, MURDOCK, and SHAW, JJ„ concur.
WOODALL, J., concurs specially.
COBB, C.J., recuses herself.

. Section 17-11-15, Ala.Code 1975, provides:
“In any municipal election that is held at a time different from a primary or general election, the duties with reference to the handling of absentee ballots which are required of the circuit clerk shall be performed by the town clerk, city clerk, or other officer performing the duties of the clerk. If such clerk or other officer is also a candidate in such election, the governing body of the city or town shall appoint a qualified elector of the city or town to perform the duties. Such person so appointed shall have all the powers, duties, and responsibilities of the circuit clerk under this chapter and shall be entitled to the compensation provided by Section 17-11-14.”
The absentee voters as to whom Howell was questioned were: A.A., I.G., S.L., B.E., P.L., E.Z.T., and E.T.

. Following P.C.’s testimony, J.J. was called to testify. Wolff's counsel indicated that J.J. was not available but stated that J.J.’s name was handwritten in on the district-two voter list and that her name did not appear on the secretary of state’s voter list.

. At the conclusion of E.R.'s testimony, J.P. was called. However, J.P. was not in the courtroom. Wolff’s counsel indicated that J.P.’s name was handwritten in on the voter list used by the City but that his name also appeared on the secretary of state’s voter list, although his address was different on that list.

. Nothing in the record indicates that the City and Conecuh County had a contract pursuant to § 11-46-4, Ala.Code 1975, for the county *949 to provide the City a list of voters registered to vote in City elections.

. Nothing in the record indicates that the parties submitted to the circuit court a table of how the voters voting by absentee ballots voted.

. Section 17-1-1, Ala.Code 1975, provides in pertinent part: "All of the provisions of this title shall apply to ... elections by ... municipalities held in this state, except in cases where the provisions of this tide are inconsistent or in conflict with the provisions of a law governing ... municipal elections.”

. The circuit court allowed four of the votes challenged on the basis of Roper’s testimony to stand.

. "[I]f he or she signs by mark, the name of the witness to his or her signature shall be signed thereon.” § 17-11-4.

. The information required on the affidavit is: (1) residence information and birth date; (2) the reason for voting by absentee ballot; (3) the voter's oath that the information is correct; and (4) the voter’s signature and required witnessing.

.Although Fluker’s trial counsel objected to the handwriting expert's testimony on the grounds set out above, it appears that trial counsel did not know that a handwriting expert would be testifying. However, Fluker’s trial counsel did not object to the testimony on the ground that Wolff was presenting a surprise witness.